6 Cal.4th 435 (1993)
862 P.2d 751
24 Cal. Rptr.2d 751
In re ZACHARIA D., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
WENDY H. et al., Defendants and Appellants.
Docket No. S028817.
Supreme Court of California.
December 6, 1993.
*438 COUNSEL
Steven D. Schatz and Stephen S. Buckley, under appointments by the Supreme Court, for Defendants and Appellants.
Terry C. Andrus, County Counsel, and Michelle Ben-Hur, Deputy County Counsel, for Plaintiff and Respondent.
Lloyd M. Harmon, Jr., County Counsel (San Diego), Susan Strom, Chief Deputy County Counsel, Gary C. Seiser and Kathryn E. Krug, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Respondent.
*439 Harold La Flamme, Duane T. Neary and John L. Dodd, under appointments by the Supreme Court, for Minor.
OPINION
ARABIAN, J.
In this case we determine whether the juvenile court properly declined to order either reunification services for Javan W. with his biological son, Zacharia D., or Javan's custody of Zacharia. In particular, we decide whether one who is a biological but not a presumed father is entitled to reunification services under Welfare and Institutions Code section 361.5, and whether such services may be requested for the first time after the 18-month review hearing. We further decide whether a biological but nonpresumed father is entitled to immediate placement of the minor in his custody under Welfare and Institutions Code section 361.2, and whether that section is applicable 20 months after the child is removed from the custodial parent's home. We conclude that only a presumed father is a "parent" entitled to reunification services with and/or custody of his child under the applicable statutory sections, that reunification services are not available under Welfare and Institutions Code section 361.5 after any reunification period has been terminated, and that section 361.2 applies only when the child is first removed from the custodial parent's home. We thus reverse the judgment of the Court of Appeal.

I. FACTS AND PROCEDURAL BACKGROUND
Zacharia D. was born to Wendy H. on August 12, 1989, with methamphetamine traces in his blood. Wendy named Lee D. as Zacharia's father on the birth certificate. Wendy and Lee had been together for four years, and were living together at or about the time Zachariah was conceived. Nine months prior to Zacharia's birth, however, Wendy spent approximately two weeks with a prior high school boyfriend, Javan W., and engaged in numerous acts of sexual intercourse with Javan during this time period.
On August 13, Zacharia was taken into protective custody by the Orange County Social Services Agency (County). On August 14, a dependency petition was filed, alleging that Zacharia came within Welfare and Institutions Code[1] section 300, subdivisions (a) (serious physical harm), and (b) (failure to protect), as a result of Wendy's intermittent prenatal ingestion of crystal methamphetamine and Lee's failure to protect Zacharia from Wendy's illegal drug use. The petition further alleged that both Wendy and *440 Lee had a history of drug use and transiency. On August 16, a detention hearing was held, and Zacharia was ordered released to his parents' custody.
At the pretrial hearing on September 11, 1989, Wendy and Lee pled no contest to the allegations of the amended petition, and Zacharia was declared a dependent of the juvenile court. The court authorized Zacharia's supervised release to Wendy and Lee and approved a service plan.
Wendy and Lee failed to attend drug rehabilitation or parenting classes, apparently continued their drug use, and abandoned Zacharia to the care of his stepgrandmother. On October 20, the County again took custody of Zacharia. On October 24, 1989, the County filed a supplemental petition alleging under section 300, subdivision (b), that Wendy and Lee were not satisfying the service plan, and were unable to care for Zacharia. At the time of the petition, Wendy had left Lee and Zacharia, and her whereabouts were unknown.
On October 25, a detention hearing was held, and Zacharia was detained in protective custody. At the pretrial hearing on November 17, Wendy and Lee, having apparently reunited, pled no contest to the allegations of the amended supplemental petition. A reunification plan was adopted by the court.
At the six-month review hearing on March 9, 1990, all parties stipulated that Zacharia's return would create a substantial risk of detriment to his physical or emotional well-being.
In November 1990, Wendy and Lee again separated. According to Javan, Wendy moved in with Javan and his parents. At this time, Javan first learned that Zacharia existed. Javan asked "to see the pictures of [Wendy's] child ... and I compared them to mine and we looked identical...."[2] Javan met Zacharia in January 1991, but remained unsure as to whether he was the father. Javan did not attempt to establish a relationship with Zacharia during this period, or indicate any willingness to support him. Nor did he communicate his suspicions to the County or the court.
Meanwhile, the dependency proceedings concerning Wendy, Lee, and Zacharia continued. At the 12-month review hearing held on January 25, 1991, the parties stipulated that Wendy and Lee had not substantially complied with the reunification plan, and that Zacharia's return would create a substantial risk of detriment to his physical or emotional well-being. An 18-month review hearing was ultimately set for March 14, 1991.
*441 On February 19, Lee informed the social worker that he had decided to terminate all reunification efforts with Zacharia.[3]
On March 14, 1991, fearing that Wendy would lose Zacharia at the 18-month review hearing, Javan came forward and asked the court if he could be tested for paternity.[4] The court granted the request, and appointed counsel for him. The 18-month hearing was trailed to March 20.
At the 18-month hearing on March 20, Wendy testified that she never completed the parenting and drug programs required by her reunification plan. She also said that she had been in a personal relationship with Javan for approximately one month. Wendy, who was 22 at the time of the hearing, had known Javan since she was 16. Javan was 23 years old at the time of the hearing.
Javan also testified at the March 20 hearing. In response to the question, "When was Zacharia born?" the following colloquy occurred: "I believe it was August she told me." "Of when?" "I'm not sure if it was '89 or '90; '89, I think." In response to the question of when Zacharia was conceived, Javan testified, "I believe it was '88; yeah, '88 or '89." Counsel inquired, "It sounds like you can't tie it down any closer than one year; is that right, '89 or '90?" "No."
Javan was also asked, "What was it exactly that ... compelled you suddenly to come forward?" He replied, "I thought it was time." Upon further inquiry, he explained, "She was losing her baby, why wouldn't I come forward?"
The court found that Zacharia could not be returned to Wendy because to do so would create a substantial risk of detriment to his physical and emotional well-being. The court further found that reasonable reunification services had been offered or provided to Wendy, and terminated those services. A section 366.26 permanency planning hearing was set for July 10, 1991.
On April 24, 1991, the results of Javan's blood tests were filed with the court. They revealed a 99.9 percent probability that Javan was Zacharia's *442 biological father. Javan's "18-month hearing,"[5] as referred to by the parties, was scheduled for April 25. However, on or about April 24, Javan was incarcerated for a probation violation resulting from a felony drug conviction.[6]
On May 8, 1991, the court granted Javan leave "to file any motions with respect to determination of parenthood" no later than May 21, 1991. On May 30, 1991, Javan filed a complaint to establish a parental relationship in the juvenile court. Javan sought custody and visitation rights. He was still incarcerated at this time. At a hearing held on this date, counsel stipulated that Javan was Zacharia's biological father.
On June 7, 1991, at Javan's "18-month review hearing," the court declared that Javan was Zacharia's natural father, and that a father-child relationship under Civil Code section 7006 existed.
At the hearing, several witnesses testified, including Lon Soltero, Zacharia's social worker. Soltero testified that prior to Javan, he had never had a case where a new father had come forward after the 18-month reunification period had expired. When Javan first claimed to be the father, Soltero was internally instructed by the County not to arrange for any visitations for Javan until it was determined "whether or not he had any right to a visit."
Once the blood test results were received at the end of April, Soltero asked Javan if he would like visitations with Zacharia. Javan said yes. Because Javan was incarcerated, Soltero suggested he avail himself of parenting and drug rehabilitation classes, "anything of that nature that might be available to him in jail." Soltero's "thinking was the sooner he gets going on that, the quicker possible reunification could take place." When asked if he had ever prohibited Javan from visiting Zacharia, Soltero answered, "No. In fact I have probably gone further than I should have" considering how little the County knew about Javan.
As of June 7, 1991, Javan had not requested that Zacharia visit him in jail, requested any reunification services, or taken either a parenting or drug *443 rehabilitation class. Soltero was not aware of any effort by Javan since he came forward to support Zacharia, give him any gifts, write him any letters, or make any inquiries as to Zacharia's needs, state of health, or what kind of child he was. In Soltero's opinion, if Javan committed himself to developing a relationship with Zacharia, to parenting classes and drug testing and counseling, and if he stabilized his income and place of residence, he might in six months be ready for a trial visit with, but not custody of, Zacharia.
Javan also testified at the June 7 hearing. He said that he had been living with Wendy at his mother's house since Thanksgiving 1990, and that they had plans to marry. When asked when he had decided to come forward as a father, he said, "I realized she was going to lose him at the 18-month review and I basically thought it was time, it was now or never." When asked whether he had attempted to find out whether Wendy was pregnant after their romantic interlude, Javan answered, "No, it didn't occur to me."
The juvenile court found pursuant to section 366.22, subdivision (a),[7] that Zacharia's return to Javan would create a substantial risk of detriment to Zacharia's physical and emotional well-being because Javan had no relationship with the child, had a long-standing debilitating drug problem, and planned to marry Wendy, a woman whose care of Zacharia had already been adjudicated detrimental to his well-being. The court also questioned whether Javan was sincerely motivated to act as a father.
As for the question of reunification services, the court found by clear and convincing evidence that reasonable reunification services had been offered or provided to Javan. In particular, the court stated that the County had no obligation to offer Javan reunification services until the court declared him a parent, which had not occurred until June 7 because of Javan's "own doing."[8] The court terminated reunification services, and set a section 366.26 hearing.
*444 Two and a half months prior to the October 24, 1991, section 366.26 hearing, Wendy gave birth to another child with Javan. Three weeks prior to the hearing, Wendy and Javan were married.
At the section 366.26 hearing, the court determined by clear and convincing evidence that Zacharia was likely to be adopted. The court further found that the prior finding that Zacharia could not be returned home was a sufficient basis on which to terminate parental rights. The court also found that the evidence did not prove by a preponderance that termination of parental rights would be detrimental to Zacharia, or that Zacharia would benefit from continuing a relationship with his parents, and therefore termination of parental rights was in Zacharia's best interests. Wendy's, Javan's, and Lee's parental rights were terminated.
Javan and Wendy appealed. The Court of Appeal reversed. In reviewing Javan's appeal, the court assumed that Javan, as the biological father, was entitled to receive reunification services before his parental rights could be terminated. The court held that the "undisputed evidence taken as a whole does not show Javan's delay [in coming forward] to be so egregious as a matter of law as to obviate the statutory requirement that he be offered reunification services."
The Court of Appeal then considered Javan's rights "given the unique posture of this case." The court observed that section 361.2, subdivision (a), provides that if a parent not residing with the minor at the time the conditions prompting the juvenile court to assume jurisdiction occur requests custody, "the court `shall' place the minor with that parent unless it finds placement would be detrimental." The court rejected the juvenile court's bases for finding detriment under section 366.22, concluding Javan had never had an opportunity to establish a relationship with Zacharia, there was no finding that Javan's long-standing drug problem alone supported a finding of detriment, and there was no demonstration that Javan had failed to or *445 was unable to protect Zacharia from whatever harm Wendy might do. "Accordingly, there being no sufficient finding of detriment, Zacharia must be placed ... with Javan under section 361.2." In denying a subsequent petition for rehearing, the court emphasized that Zacharia must be placed with Javan immediately.[9]
The court concluded that its disposition of Javan's appeal obviated any need to address those issues raised by Wendy. The court noted that "termination of parental rights pursuant to section 366.26 requires `clear and convincing evidence that it is likely that the minor will be adopted'" and there was no such evidence given its ruling concerning Javan. Hence, it also reversed the juvenile court's order terminating Wendy's parental rights.
Zacharia and the County separately petitioned for review.[10] We granted their petitions to decide whether one who is a biological but not a presumed father is entitled to reunification services under section 361.5, and whether such services may be requested for the first time after the 18-month review hearing. We further decide whether a biological but nonpresumed father is entitled to immediate placement of the minor in his custody under section 361.2, and whether that section is applicable 20 months after the child is removed from the custodial parent's home.[11]

II. DISCUSSION

A. Background on Reunification Services

We recently delineated in detail the procedure in dependency proceedings in Cynthia D. v. Superior Court (1993) 5 Cal.4th 242 [19 Cal. Rptr.2d 698, 851 P.2d 1307] and In re Marilyn H. (1993) 5 Cal.4th 295 [19 Cal. Rptr.2d 544, 851 P.2d 826]. A brief overview of the policies and procedures regarding reunification services, however, is helpful to an understanding of the issues presented here.
*446 "The Legislature has recognized that a parent who has a child removed for neglect, abuse or substantial risk thereof, in most cases should be provided with services to assist the parent in overcoming the problems that led to removal. (§ 361.5.) It has also recognized that, in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate." (In re Marilyn H., supra, 5 Cal.4th at p. 308.) "[O]nce court intervention is determined necessary, children and parents should receive appropriate legal representation, time-limited and clearly focused protective and/or reunification services, and permanency planning at the earliest possible stage for those children who cannot live safely with their family." (Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) p. 2, italics added.)
In developing parameters on the reunification process, "the Legislature balanced numerous competing fundamental interests, including the child's compelling interest in `a placement that is stable, permanent, and which allows the caretaker to make a full emotional commitment to the child,' the parents' compelling `interest in the companionship, care, custody and management' of their child (In re Marilyn H., supra, 5 Cal.4th at p. 306), and the `preservation of the family whenever possible....' (§ 300, subd. (j).)" (In re Matthew C., ante, 386, at p. 400 [24 Cal. Rptr.2d 765, 862 P.2d 765].) "As we have often recognized, the Legislature is in the best position to weigh such diverse and competing concerns and devise an appropriate statutory scheme." (Ibid.)
Accordingly, while the dependency scheme generally requires that parents be offered reunification services, the Legislature has limited those services to "a maximum time period not to exceed 12 months," which under certain circumstances may be extended to 18 months.[12] (§ 361.5, subd. (a).) This 18-month period is calculated from "the date the child was originally taken from the physical custody of his or her parent...." (§ 366.21, subd. (g)(1).) The reunification period may be as short as six months, and in some dependency cases there may be no reunification period at all. (See §§ 366.21, subd. (e), 361.5, subd. (b); In re Troy Z. (1992) 3 Cal.4th 1170, 1177 [13 Cal. Rptr.2d 724, 840 P.2d 266].) The reunification period is expressly not tolled by the parents' physical custody of the child, or by the parents' absence or incarceration. (§ 361.5, subds. (a), (d) & (e)(1).)
*447 The juvenile court must review the case at least once every six months. (§ 366.) Under current law, "At the review hearings the state must ... present evidence that reasonable reunification services have been provided to the parent." (In re Marilyn H., supra, 5 Cal.4th at p. 308.) "If the child may not safely be returned to the parents within a maximum of 18 months from removal," the court must terminate reunification efforts and set a section 366.26 selection and implementation hearing. (Ibid.; §§ 366.21, subd. (f), 366.22, subd. (a).) "Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parent's custody." (In re Marilyn H., supra, 5 Cal.4th at p. 308.) "[T]he proceeding terminating reunification services and setting a section 366.26 hearing is generally a party's last opportunity to litigate the issue of parental fitness as it relates to any subsequent termination of parental rights, or to seek the child's return to parental custody." (In re Matthew C., supra, ante, at p. 392.) If there is clear and convincing evidence that the child will be adopted, and there has been a previous determination that reunification services should be ended, termination of parental rights at the section 366.26 hearing is relatively automatic. (Cynthia D., supra, 5 Cal.4th at pp. 249-250.)
"[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency." (In re Marilyn H., supra, 5 Cal.4th at p. 310.) "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (Id. at p. 309.) "The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides the `escape mechanism' that ... must be built into the process to allow the court to consider new information." (Ibid.)

B. Entitlement of Biological Father to Reunification

1. Definition of "Parent"

Section 361.5, subdivision (a), added to the Welfare and Institutions Code in 1986 by Senate Bill No. 1195, 1985-1986 Regular Session, provides: "Except as provided in subdivision (b), whenever a minor is removed from a parent's or guardian's custody, the juvenile court shall order the probation officer to provide child welfare [reunification] services to the minor and the minor's parents or guardians for the purpose of facilitating reunification of *448 the family within a maximum time period not to exceed 12 months[[13]].... Services may be extended up to an additional six months if it can be shown that the objectives of the service plan can be achieved within the extended time period."
Neither in this section nor anywhere else in the child dependency statutes, or in the legislative history to Senate Bill No. 1195,[14] does the Legislature define, although it often uses, the word "parent." In fact, "parent" is the only word used in the dependency statutes up until the point where the statutes begin to address the section 366.26 hearing, or the hearing at which parental rights may be terminated. Courts have concluded that the word "parent" in the dependency statutes does not include de facto or stepparents. (See In re Jodi B. (1991) 227 Cal. App.3d 1322, 1328-1329 [278 Cal. Rptr. 242] [stepparent is not a "parent" for purposes of reunification]; In re Jamie G. (1987) 196 Cal. App.3d 675, 679, 684 [241 Cal. Rptr. 869] [de facto parents not "parents" entitled to further reunification services].)
Once the dependency statutes address the issue of possible termination of parental rights, they begin to differentiate between the rights of "presumed," "natural," and "alleged" fathers. The first occurrence of this distinction is in section 366.23, subdivision (a), which provides that both presumed and alleged fathers are entitled to notice of the section 366.26 hearing at which parental rights may be terminated. In addition, section 366.26, subdivision (i), refers to "natural" parents, and section 366.26, subdivision (a), expressly incorporates Civil Code section 7017, which uses the terms "natural" and "presumed" father.
The word "parent" is defined in the Uniform Parentage Act (UPA), Civil Code section 7000 et seq. In particular, the UPA "distinguishes between a `presumed father' and one who is merely a `natural father'" (Michael U. v. Jamie B. (1985) 39 Cal.3d 787, 790 [218 Cal. Rptr. 39, 705 P.2d 362], superseded on other grounds by statute), "according presumed fathers *449 greater rights than natural fathers."[15] (In re Shereece B., supra, 231 Cal. App.3d at p. 622; see In re Sarah C. (1992) 8 Cal. App.4th 964, 974 [11 Cal. Rptr.2d 414] ["parental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother [and/or] child through marriage (or attempted marriage) or his commitment to the child"]; cf. Adoption of Kelsey S., supra, 1 Cal.4th at p. 844 ["it is clear that Legislature meant to provide natural fathers with far less rights than both mothers and presumed fathers have under California's statutory system"].) Under Civil Code section 197,[16] both the mother and presumed father, but not the natural father, "are entitled to custody of their minor children." (In re Baby Girl M., supra, 37 Cal.3d at pp. 71, 72; see In re Shereece B., supra, 231 Cal. App.3d at p. 622 [presumed, not natural, father entitled to custody]; In re Kelvin M. (1978) 77 Cal. App.3d 396, 399-400, 403 [143 Cal. Rptr. 561] [presumed father entitled to custody under Civil Code section 197 and hence due process requires opportunity to be heard at dependency jurisdictional hearing].)
In order to become a presumed father, a man must fall within one of several categories enumerated in Civil Code section 7004, subdivision (a). The only relevant category in this case is section 7004, subdivision (a)(4), which provides that a natural father may become a presumed father if "[h]e receives the child into his home and openly holds out the child as his natural child." (See In re Phoenix B. (1990) 218 Cal. App.3d 787, 790, fn. 3 [267 Cal. Rptr. 269]; id. at p. 792 [presumed father status achieved when alleged father "came forward when the Department instituted dependency proceedings, offered to care for his daughter, took her into his home and ... held her out as his child"].) The "superior court ha[s] the authority to grant [a biological father] custody of his child so that he [can] qualify as a presumed father under section 7004, subdivision (a)."[17] (Adoption of Kelsey S., supra, 1 Cal.4th at p. 842; see Michael U. v. Jamie B., supra, 39 Cal.3d at p. 791 [if *450 natural father "actually acquired physical custody, he could receive [the child] into his home and thereby acquire the status of a presumed father"]; Civ. Code, § 7010, subd. (c).)[18]
In addition, in Adoption of Kelsey S., supra, 1 Cal.4th 816, we held that "section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (Id. at p. 849, italics in original.) Under such circumstances, "[i]f an unwed [biological] father promptly comes forward and demonstrates a full commitment to his parental responsibilities  emotional, financial, and otherwise  his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Ibid.)[19]
In "emphasiz[ing] the narrowness of our decision," we stated that the "statutory distinction between natural fathers and presumed fathers is constitutionally invalid only to the extent it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities. Our statutes (§§ 7004 & 7017, subd. (d)(2)) are constitutionally sufficient when applied to a father who has failed to make such a showing." (Adoption of Kelsey S., supra, 1 Cal.4th at pp. 849-850, italics in original.)
Here, we examine only a biological father's right to reunification services and custody, not the standard under which his parental rights are terminated. *451 As in the adoption context addressed in Kelsey S., however, a biological father's paternal rights may ultimately be terminated in the dependency process. Such termination is almost inevitable if a father is not involved in the dependency process prior to the section 366.26 hearing. The issue would arise therefore, under facts not presented here, whether the statutory distinctions between biological and presumed fathers are unconstitutional as applied to a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays a commitment consistent with the standard set forth in Kelsey S. Extending Kelsey S. to apply in the dependency context would allow such a father to participate as a "parent" in, or end the need for, the dependency proceedings. However, under no view of the evidence did Javan demonstrate such a commitment, or satisfy any of the Kelsey S. criteria during the relevant period in this case. Nor does Javan claim he was precluded from attaining presumed father status by Wendy or any third party. Thus, we need not address this constitutional issue here.

2. Application of the UPA Definition Here

(1) The dependency statutes do not expressly incorporate the definitions of "parent" from the UPA. Such an incorporation, however, can be fairly implied by the use of the terms "presumed," "natural," and "alleged" father in sections 366.23 and 366.26. Applying the UPA definition to the dependency context, we conclude that only a presumed, not a mere biological, father is a "parent" entitled to receive reunification services under section 361.5. (See In re Sarah C., supra, 8 Cal. App.4th at pp. 974-975.)
Under Civil Code section 197, only a presumed father is entitled to custody of his child; custody is the consequence of either a successful reunification plan or a placement of the child with the father under section 361.2. Moreover, the Legislature uses the word "parent" at all times prior to the sections regarding termination of parental rights, and only then differentiates among alleged, natural, and presumed fathers. We are reluctant to conclude that the Legislature's use of different terms, at different times in the statutory scheme, is meaningless. Finally, interpreting "parent" to include a strictly biological father would introduce into the dependency context fathers who had never demonstrated any commitment to the child's welfare. (Cf. Adoption of Kelsey S., supra, 1 Cal.4th at p. 838 ["biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship"].) Indeed, such an interpretation would arguably grant "reunification services to a rapist or an anonymous sperm donor." (In re Sarah C., supra, 8 Cal. App.4th at p. 975.)
*452 Here, Javan failed to achieve presumed father status. The Court of Appeal therefore erred in concluding that he was a "parent" entitled to receive reunification services. We now address the effect of the 18-month limitation on reunification services on a biological father's efforts to attain presumed father status and receive the benefit of such services with his child.

C. Effect of 18-Month Limit on Reunification

As we noted earlier, the Legislature has statutorily limited reunification services to "a maximum time period not to exceed 12 months," which under certain circumstances may be extended to 18 months. (§ 361.5, subd. (a).) The 18-month period is not tolled by the parents' physical custody of the child, or by the parents' absence or incarceration. (§ 361.5, subds. (a), (d) & (e)(1).)
What all of these express nontolling events have in common is that they prevent a parent's unilateral action from impeding a child's permanent and timely placement. (2) We conclude that the 18-month period is therefore also not extended, under the circumstances of this case, by an alleged father's own failure to ascertain the existence of his child, or by his decision to wait until the 18-month hearing to assert his paternity claim.
Here, Javan engaged in at least a dozen acts of sexual intercourse with Wendy over a two-week period. There is no evidence that he had any reason to expect that this sexual relationship had not resulted in pregnancy. Rather, Javan testified that this possibility "didn't occur to [him]." There is also no evidence that Wendy ever hid herself, her pregnancy, or their child from Javan. Javan knew where Wendy was living after November of 1988, and "could have found her." In fact, Javan and Wendy had known each other many years, had been high school sweethearts, and eventually were married. Javan's ignorance of Zacharia's existence was born not of malevolence on the part of Wendy or the County, but of his own indifference.
While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any "opportunity to develop that biological connection into a full and enduring relationship." (Adoption of Kelsey S., supra, 1 Cal.4th at p. 838.)
Here, the County did not know of or have reason to suspect Javan's paternity claim during Zacharia's first 19 months. While the dependency *453 statutes require the County to make an effort to locate absent parents, the County in this case had no reason to suspect Zacharia had an absent "parent." Lee, the man named as Zacharia's father on his birth certificate, who had been involved with Wendy for the preceding four years, and had welcomed Zacharia into his home and acknowledged him as his son, was Zacharia's presumed father within the meaning of Civil Code section 7004. Once a presumed father has been identified, neither the child nor the social services agency may reasonably be expected to wait for other potential fathers to come forward. Thus, to the extent the County had a duty to ascertain who Zacharia's parents were, and provide them reunification services, they appear to have satisfied that obligation in this case. Indeed, Javan does not contend that prior to March 1991, the County failed to satisfy any obligation to ascertain his existence and give him notice of the dependency proceedings.
In sum, if a man fails to achieve presumed father status prior to the expiration of any reunification period in a dependency case, whether that period be 6, 12, or 18 months as in this case, he is not entitled to such services under section 361.5. Here, Javan failed to achieve such status prior to the termination of reunification services. Rather, he waited until the 18-month hearing before even asserting his alleged father status, and his biological paternity was not judicially established until several months later. His only remedy, therefore, was to file a motion to modify under section 388. We discuss this issue further below in part II.E.

D. Zacharia's Immediate Placement With Javan

(3) The Court of Appeal sua sponte ordered Zacharia's immediate placement with Javan pursuant to section 361.2, subdivision (a). This section, also added to the Welfare and Institutions Code in 1986 by Senate Bill No. 1195, provides that when a minor is ordered removed "pursuant to Section 361, the court shall first determine whether there is a parent of the minor, with whom the minor was not residing ..., who desires to assume custody of the minor. If such a parent requests custody the court shall place the minor with the parent unless it finds that placement with that parent would be detrimental to the minor."
Nothing in this statute suggests that custody must be immediately awarded to a noncustodial parent regardless of when in the dependency process the parent comes forward. Rather, its language suggests that the statute is applicable only at the time the child is first removed from the custodial parent or guardian's home. Our interpretation is reinforced by the absence of a similar provision requiring return of the child to a noncustodial parent in *454 the statutes governing the 6-, 12-, and 18-month review hearings. Here, Javan's paternity was not even judicially determined until 20 months after Zacharia was removed from Wendy's and Lee's custody.
Moreover, the statute's use of the words "parent" and "custody" indicate that as in section 361.5 discussed above, only a presumed father is entitled to assume immediate custody. Javan clearly had not achieved such status at the time Zacharia was removed from Wendy's and Lee's custody.
Finally, even if section 361.2 did apply at this late stage of the proceedings, the statute assumes the existence of a competent parent able to immediately assume custody. Javan met no such standard. First, he could not be a "noncustodial" parent because he was, when he was not incarcerated, by his own testimony living with and planning to marry Wendy. Moreover, he was incarcerated for drug use at the time he requested custody and at the June 7 hearing. In addition, according to the uncontroverted testimony of Zacharia's social worker, as of June 7, Javan required at least six months of services before he could even attain the parental competence to be able to visit Zacharia, let alone have custody of him.
Under the Court of Appeal's rationale, whenever a biological father comes forward, his child must be automatically placed with him absent a finding of detriment. This presumptive right to custody elevates the rights of a biological father above the child's interest in stability and permanency, and defeats the Legislature's careful balance of interests reflected in the time frame of the dependency laws. We conclude that under the circumstances of this case, section 361.2 was inapplicable, and the Court of Appeal's order requiring Zacharia's immediate placement with Javan pursuant to this section was therefore erroneous.

E. Section 388 Motion

(4) While a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388[20] for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances. *455 (See In re Marilyn H., supra, 5 Cal.4th at p. 309 [once reunification services terminated, burden on parent "to prove changed circumstances pursuant to section 388 to revive the reunification issue"]; Cal. Rules of Court, rule 1432.) "Section 388 provides the `escape mechanism' that ... must be built into the process to allow the court to consider new information." (In re Marilyn H., supra, 5 Cal.4th at p. 309.)
(5) Javan never filed a motion under section 388. However, he did seek custody and visitation rights in his petition to be declared Zacharia's father. Moreover, his counsel impliedly requested reunification services at the June 7 hearing by requesting a continuance so that the County could ascertain what reunification services Javan would require.
In denying these requests, the juvenile court applied the standard applicable to 18-month review hearings set forth in section 366.22, subdivision (a). That section provides: "[A]t the 18-month hearing, [the court] shall order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." In making its determination, the court is to review the probation officer's report, review and consider the report and recommendations of any appointed child advocate, and consider the extent to which the parent cooperated and availed himself of the services provided. (§ 366.22, subd. (a).) This "substantial risk of detriment" standard is arguably more stringent than the "best interests of the child" standard of section 388.
The juvenile court concluded that Zacharia's return to Javan would create a substantial risk of detriment to Zacharia's physical and emotional well-being because Javan had no relationship with the child, had a long-standing drug problem, and planned to marry Wendy, a woman whose care of Zacharia had already been adjudicated detrimental to his well-being. The court also questioned whether Javan had demonstrated sufficient motivation to act as a father. In addition, we note that at this time Javan was incarcerated for drug use, and required at least six months of services before he would attain the parental competence to be able to visit, let alone have custody of Zacharia. Javan had done almost nothing to develop a relationship with Zacharia, and had only vague plans of how he would care for him. Indeed, Javan's articulated impetus for coming forward was not one based on Zacharia's needs and interests, but rather on Wendy's impending loss of parental rights.
*456 The juvenile court's finding of substantial risk of detriment under section 366.22, subdivision (a), which was supported by substantial evidence, indicates that it would have likewise found under section 388 that it was not in Zacharia's best interests to grant Javan reunification services or custody.

CONCLUSION
Contrary to the conclusion of the Court of Appeal, the juvenile court properly concluded that Javan was not entitled to either reunification services under section 361.5 or custody. Moreover, the juvenile court's implied finding that it was not in Zacharia's best interests to grant Javan reunification services or custody was supported by substantial evidence.
Because we conclude the Court of Appeal erred in determining that Javan was entitled to reunification services and immediate custody of Zacharia, and because Wendy has not appeared in this court, we further conclude that the Court of Appeal's judgment reversing the order terminating her parental rights was likewise in error.
Accordingly, the judgment of the Court of Appeal is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.
Lucas, C.J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.
Appellants' petition for a rehearing was denied February 24, 1994.
NOTES
[1] All statutory references contained herein are to the Welfare and Institutions Code unless otherwise indicated.
[2] Javan testified that it could have been as early as October that he saw the photographs and suspected Zacharia was his child.
[3] On June 29, Lee confirmed in writing that he wished to relinquish any "claims I may have to" Zacharia, and his parental rights were subsequently terminated.
[4] No party objected on the ground that Javan lacked standing to request a paternity determination. Moreover, a juvenile court has authority to "make a finding of paternity of a child regarding whom a petition has been filed under section[] 300...." (Cal. Rules of Court, rule 1412(l); see In re Lisa R. (1975) 13 Cal.3d 636, 643-644 [119 Cal. Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017].)
[5] The dependency statutes provide for an 18-month review hearing to review the parent-child reunification efforts, and the possibility of returning the child to the parent's custody. Since Javan had never been a party to the dependency proceedings concerning Zacharia, requested or received reunification services, or even attempted to establish his paternity prior to March 1991, the term "18-month hearing" was inappropriately used in this context. Rather, the hearing set in response to the blood test results was more along the lines of a hearing on a motion to modify under section 388 an earlier ruling of the juvenile court on the basis of new evidence or changed circumstances. (See, post, pt. II.E.)
[6] Javan had "missed a couple tests and had one dirty test" and conceded he had used drugs while on probation. The underlying conviction was for possession and being under the influence of methamphetamine. Javan also had one other prior conviction for possession of crystal methamphetamine.
[7] Section 366.22 governs a juvenile court's findings at the 18-month hearing. As noted earlier, the June 7 hearing was not properly denoted an 18-month hearing. Rather, as discussed more fully in part II.E., post, because reunification services had already been terminated, Javan's remedy was a motion under section 388.
[8] The court stated in part: "[Your attorney] talked about your taking action when you first had a glimmer that this child might be yours. Okay, I think the most relevant glimmer from the point of view of this case is the one you had in your eye back around November of 1988, and I say that not to be silly, because I really think that is where this case begins.... Men on this planet for several million years have with impunity planted their seeds and then moved on.... And if you do that, as you did here, ... [i]f you have sexual intercourse with a woman of child-bearing years ... you have good cause to believe that you may have just created a human being.... So you as a male human being, if you want to protect your rights as a father, I think you've got to keep in touch.... So if you don't keep in touch with a woman with whom you have had intercourse, then you are putting yourself at risk to be a day late and a dollar short. So the real glimmer doesn't start here when you decide or when you look at a picture and say, `Boy, you know, that could be my twin.' All right. The glimmer starts and your responsibility begins when you have intercourse with her.... And that is the position I am taking here.... [I]f you are really a sincere guy and you want to put on the cloak of fatherhood, then you should have run down here, not walked. Instead, what you did is you played a little strategy game and decided, well, it's not until push comes to shove and maybe mom is going to get her rights cut off that you will come forward. Your choice, your strategy, but you burned up maybe five months of time that would have made you look a lot better. So my conclusion is that you really haven't acted like a guy who should be considered as a real candidate for fatherhood so far. So there has been no obligation to offer you services up to now and it is your own fault."

The court also found that Javan knew where Wendy was living after November 1988, and "could have found her," and that Wendy did not hide Zacharia from Javan.
[9] The record does not indicate whether or not Zacharia was, in fact, placed in Javan's custody. In response to this court's inquiry, we have been informed by Zacharia's counsel that Zacharia remains in the foster-adoptive home in which he was placed several months prior to the Court of Appeal's decision.
[10] Counsel was appointed for Javan in this court, and he filed answer briefs in response to the opening briefs of Zacharia, the County, and amicus curiae San Diego County. Wendy, however, has never sought appointment of counsel or otherwise appeared in this court. Nor did she join in Javan's briefs. Accordingly, we conclude that Wendy is not contesting the position of Zacharia, the County, and San Diego County that the juvenile court's order terminating her parental rights should be affirmed.
[11] In his answers to the petitions for review, Javan requested that if review were granted, this court also consider certain additional issues, none of which were addressed by the Court of Appeal. Prior to oral argument, we issued an order limiting the issues to those raised in the petitions for review. (See Cal. Rules of Court, rule 29.2(b).)
[12] Under section 366.3, if a juvenile court does not terminate parental rights, but "orders a permanent plan of adoption or legal guardianship pursuant to Section 366.25 or 366.26," further reunification services may be provided. (§ 366.3, subds. (a), (b) & (c).) Here, however, the juvenile court terminated the parental rights of Javan, Wendy, and Lee. We therefore need not address the rights, if any, of a mere biological father with respect to such further reunification services.
[13] Section 361.5, subdivision (b), contains certain exceptions pursuant to which a juvenile court may refuse to order reunification services. When in this opinion we discuss the definition of who is a "parent," it is for the purpose of determining who is, absent these exceptions, entitled to reunification services under section 361.5. We do not imply that once someone is found to be a "parent," the juvenile court is without discretion to deny reunification services under these or any other exceptions.
[14] In this regard, we have consulted the legislative history of both section 361.5 and section 361.2 (see, post, pt. II.D.), obtained by this court from the state archives. In addition, we have reviewed the legislative history of various dependency statutes contained in Zacharia's March 3, 1993, request for judicial notice. That request is hereby granted.
[15] A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in Civil Code section 7004. (In re Baby Girl M. (1984) 37 Cal.3d 65, 72, fn. 5 [207 Cal. Rptr. 309, 688 P.2d 918], superseded on other grounds by statute; Adoption of Kelsey S. (1992) 1 Cal.4th 816, 823, fn. 3 [4 Cal. Rptr.2d 615, 823 P.2d 1216].) A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father. (See In re Shereece B. (1991) 231 Cal. App.3d 613, 620-621 [282 Cal. Rptr. 430].)
[16] Civil Code section 197 provides that "The mother of an unmarried minor child is entitled to its custody, services and earnings. The father of the child, if presumed to be the father under subdivision (a) of Section 7004, is equally entitled to the custody, services and earnings of the unmarried minor. If either the father or mother be dead or unable or refuse to take the custody or has abandoned his or her family, the other is entitled to its custody, services and earnings." (Italics added.)
[17] Such an order in the dependency context would be made pursuant to a motion under section 388. (See, post, pt. II.E.)
[18] Under Civil Code section 7004, subdivision (a)(4), it is possible for a man to achieve presumed father status, with its attendant rights and duties, without being the biological father. The UPA allows for the presumption of paternity that arises under Civil Code section 7004, subdivision (a)(4) to be "rebutted by a court decree establishing paternity of the child by another man." (Civ. Code § 7004, subd. (c); see In re Olivia H. (1987) 196 Cal. App.3d 325, 330 [241 Cal. Rptr. 792].)

That is the scenario in this case. Lee was named on the birth certificate as Zacharia's father, received Zacharia into his home and openly held him out as his natural child. Lee was thus accorded reunification services and visitation rights as Zacharia's presumed father. Ultimately, this presumption was rebutted by blood tests establishing that Javan was the biological father.
[19] In determining whether a biological father has demonstrated such a commitment, "[t]he father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate `a willingness himself to assume full custody of the child  not merely to block adoption by others.'" (Adoption of Kelsey S., supra, 1 Cal.4th at p. 849, italics in original.) "A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (Ibid., fn. omitted.)
[20] Section 388 provides that "Any parent or other person having an interest in a child who is a dependent child of the juvenile court or the child himself through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and, if made by a person other than the child, shall state the petitioner's relationship to or interest in the child and shall set forth in concise language any change of circumstance or new evidence which are alleged to require such change of order or termination of jurisdiction. [¶] If it appears that the best interests of the child may be promoted by the proposed change of order or termination of jurisdiction, the court shall order that a hearing be held and [notice given]...." (Italics added.)