[No. G030609. Fourth Dist., Div. Three. Dec. 9, 2002.]

In re JOSHUA R., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JOSHUA L., Defendant and Appellant.

COUNSEL

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, and Robert G. Overby, Deputy County Counsel, for Plaintiff and Respondent.

John L. Dodd, under appointment by the Court of Appeal, for Minor

**OPINION**

**O'LEARY, Acting P. J.**—An alleged father waited three and a half years, until the filing of a third dependency petition concerning his alleged child, before requesting paternity testing. He had never developed any relationship with the child, and had declined to participate in all previous dependency hearings. The juvenile court denied the request, finding the question of biological paternity irrelevant where the man would not qualify as a presumed father. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This is the third round of dependency proceedings for five-year-old Joshua R. (the minor). He was first taken into protective custody on February 4, 1997, immediately after his birth to an incarcerated and drug-addicted 17-year-old mother. Mary R. was in juvenile hall for theft and drug offenses.

She did not know the identity of the minor's father, but named three possible candidates, including appellant, whom she identified only as "Josh." The court made a due diligence finding as to efforts to locate the alleged fathers, and entered their defaults. The minor remained in foster care until March 26, 1998, when the court terminated the dependency proceedings upon finding Mary had complied with her case plan.

That success was short lived. Three months later, Mary abandoned the minor to her mother's care. On June 24, 1998, a second original dependency petition was filed concerning the minor. (Welf. & Inst. Code, § 300, subds. (b) [failure to protect] & (g) [no provision for support].)[1] The petition alleged mother's whereabouts were unknown, as were father's identity and whereabouts. On July 23, the court ordered the Orange County Social Services Agency (SSA) to search for alleged fathers "Josh [unknown]" and Patrick D. SSA found appellant, Joshua L., at Wasco State Prison. He received notice of the dependency proceedings and an order for transportation to the next hearing.

On August 19, 1998, Joshua signed a form denying paternity. The form stated, "I, Joshua L[.], having been alleged to be the father of the child of Mary [R.] born on 2-4-97, state that I am not the father of said child." The form further acknowledged Joshua was "giv[ing] up any claim to family reunification services and to notice of Juvenile Court dependency hearings regarding said child." On September 1, Joshua signed another form waiving his right to appear at the upcoming hearing.

On September 17, the minor was adjudicated a dependent of the juvenile court. A six-month review hearing was set for March 11, 1999. Joshua received a transportation order for the hearing but on or about February 2 he waived his right to appear at the hearing. On February 9, almost six months after Joshua formally denied paternity, SSA received a letter from him acknowledging that the minor "could very well be my son." Joshua apologized for "not coming to the child custody hearing." He explained he expected to go on work furlough in Garden Grove "in a couple of months and if I go back and forth to Court right now, it will ruin my chances of going to furlough and could prolong my incarceration another six months." He added, "I promise that when I do get out, I will go to every Court appearance for my son and do everything humanly possible to gain custody of my boy."

In the status report filed for the March 11 hearing, SSA reported that Mary identified Joshua as the father of the minor. She informed SSA she had

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

known Joshua for only three months, "they never really developed a relationship," and she had not heard from him "during the past year."

On March 15, Joshua sent another letter to SSA. He stated he had been denied work furlough "so I will remain here until I parole . . . . I have every intention to make my son priority [sic] in my life when I get out." Joshua's scheduled release date of October 21 was then seven months away. He acknowledged having "made some bad decisions of the last two years and those bad choices and my addiction with drugs has landed me right here in prison." He concluded, "I am very much interested in my son and I am more than willing to accept the full responsibility of a father. Just send whatever paper work that I have to sign to attend the next meeting."

The "next meeting" was a big one: The court set a permanency planning hearing under section 366.26 for August 4, having terminated services to Mary for noncompliance with her case plan. On June 9, the court issued a transportation order for Joshua to attend the August 4 hearing. On June 24, he signed a form waiving his right to be present at the hearing. On July 15, he signed a second form waiving his right to appear.

The section 366.26 permanency hearing was continued several times. In the interim, Mary filed a section 388 petition seeking to vacate the previous court order terminating services and setting the permanency hearing. In a supplemental report filed by SSA on October 19, 1999, the case worker stated Mary reported Joshua had called her on October 4 or 5 to ask about the minor. Now out of prison, he was aware of the permanency hearing then set for October 20 and "asked about getting a paternity test."

The section 366.26 permanency hearing (and hearing on Mary's § 388 petition) was continued to October 25. The hearing lasted two days. At its conclusion, the court granted Mary's section 388 petition and vacated the order setting the permanency hearing, based on a finding of changed circumstances. Joshua did not attend the hearing.

At the 18-month review hearing on February 14, 2000, the court ordered the minor placed with Mary. On October 11, 2000, the court terminated the dependency proceedings due to Mary's compliance with her case plan. Again, her success was fleeting. On February 24, 2002, Mary gave birth to a baby girl who tested positive for methamphetamines. A new dependency petition was filed on behalf of the minor, now five years old. The petition listed Joshua as his alleged father, address unknown. Joshua had not been in touch with Mary since sometime in 2000.

The case worker found Joshua L. in the Orange County jail. He had been convicted of a felony on October 27, 2000, and was awaiting transfer to Wasco State Prison where he was to serve a three-year sentence.

At the jurisdictional/dispositional hearing, Joshua requested paternity testing under Family Code section 7551. SSA, Mary, and the minor's counsel all opposed the request. The court concurred. The court reasoned a paternity test was irrelevant to the proceedings because Joshua would not qualify as a presumed father. Joshua appeals from the denial of his request for paternity testing.

DISCUSSION

Joshua contends the juvenile court abused its discretion by denying his request for paternity testing. He argues the statutory criteria for such testing were met and denial of testing was not in the minor's best interests. He is wrong on both counts.

Family Code section 7551 governs court-ordered paternity testing. It provides, in pertinent part, as follows: "In a civil action or proceeding *in which paternity is a relevant fact*, the court . . . shall upon motion of any party to the action or proceeding made at a time so as not to delay the proceedings unduly, order the mother, child, and alleged father to submit to genetic tests." (Italics added.) The court rejected testing on the ground paternity is not "a relevant fact" in this proceeding. Underlying that conclusion is the finding Joshua does not qualify as a presumed father of the minor.[2]

Joshua does not contest that finding. He does, however, question its significance. Joshua challenges the court's determination that his lack of presumed father status renders paternity irrelevant in this proceeding. We conclude the juvenile court got it right.

In *In re Zacharia D.* (1993) 6 Cal.4th 435 [24 Cal.Rptr.2d 751, 862 P.2d 751], the California Supreme Court held that "only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5. [Citation.]" (*In re Zacharia D., supra*, 6 Cal.4th at p. 451.) The court further held only a presumed father is entitled to custody of his child. (*Ibid.*) Consequently, in this dependency proceeding, Joshua's inability to qualify as a presumed father precludes him from obtaining either family reunification services or custody of the minor. More to the point, that result would not change even if genetic testing determined he was the minor's biological father—a step-up from alleged father.

---

[2]Pursuant to Family Code, section 7611, a man is presumed to be a child's natural father if he was married to (or in an "attempted marriage" with) the child's mother during the child's conception or birth (Fam. Code, § 7611, subds. (a)-(c)) , or if he receives the child into his home and openly holds out the child as his natural child (Fam. Code, § 7611, subd. (d)). Joshua meets none of these requirements.

We should acknowledge a theoretical advantage Joshua could gain from a finding of paternity. The juvenile court has discretion to offer a mere biological father reunification services based on a finding it would benefit the child. (§ 361.5, subd. (a).) However, we conclude the court implicitly rejected that option when it found paternity irrelevant and denied Joshua's request for genetic tests. Underlying that decision is the implied finding the minor would not benefit from the provision of services to Joshua. That finding is supported by overwhelming evidence.

Joshua has no relationship with the minor, and has never demonstrated a commitment to the child's welfare. He learned he was an alleged father when the minor was 17 months old. He waited until the child was five, and the subject of a third dependency proceeding, before requesting a paternity test.

During that three-and-a-half year gap, Joshua never sought visitation, much less custody, and never provided financial support for the child. He failed to appear at any of the previous dependency hearings concerning the minor. There is also the not insignificant fact Joshua is again in prison, serving a three-year term. These facts easily constitute substantial evidence supporting the court's implied finding the minor would not benefit from the provision of services to Joshua, were he found to be the biological father.

Because a finding of paternity would not entitle Joshua to services or custody, and would not otherwise affect the course of this dependency proceeding, we conclude the juvenile court correctly found paternity irrelevant. Consequently, one of the statutory criteria for mandatory genetic testing was unmet here, and the court properly denied Joshua's request.

Joshua valiantly tries to prove paternity is relevant despite the fact he is not a presumed father. He begins by arguing the court erred in making presumed fatherhood a "prerequisite" to genetic testing. He asserts Family Code section 7551 "does not limit blood tests to men who have already acquired presumed father status." In fact, he argues, "presumed fatherhood and paternity are mutually exclusive concepts." He asserts that because genetic testing is specifically intended for alleged fathers, his lack of presumed father status should have no bearing on his entitlement to a paternity test.

Joshua is only partly right. Because presumed fatherhood is based not on a biological connection but rather a man's *relationship* with the child (or the child's mother) (see Fam. Code, § 7611), genetic testing has no applicability in determining presumed father status. (*In re Nicholas H.* (2002) 28 Cal.4th

56, 69 [28 Cal.4th 407a, 120 Cal.Rptr.2d 146, 46 P.3d 932] [disallowing genetic testing to rebut presumed father status].) Joshua's error is in asserting the converse is necessarily true: that presumed father status (or, more precisely, the lack of it) is inapplicable in determining the right to genetic testing. Joshua's argument is not only illogical, but it ignores the clear statutory requirement of *relevancy* in Family Code section 7551.

In many cases involving alleged fathers, the question of paternity is undeniably relevant, for example, in cases concerning child support or inheritance rights. Paternity can also be relevant in a dependency proceeding where an alleged father desires to confirm his biological connection with a child as a step toward initiating a relationship that could lead to presumed father status. But in the present dependency proceeding, it is far too late for Joshua to take a "step" toward presumed fatherhood. His possible paternity of the minor is simply not relevant because, after three and a half years, his failure to achieve presumed father status forecloses his participation in this dependency proceeding.

As the Supreme Court noted in *In re Zacharia D., supra,* 6 Cal.4th at page 452, "While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any 'opportunity to develop that biological connection into a full and enduring relationship.' [Citation.]"

In his next relevancy argument, Joshua asserts a blood test showing him to be the biological father would enable him to file an action under Family Code section 7630 to establish a parent-child relationship. He contends that action would result in a judgment entitling him to all the rights and privileges of parenthood, including reunification services. But he fails to explain how he can bootstrap himself into greater parental rights (e.g., the right to reunification services) through the vehicle of a Family Code section 7630 action.

Section 316.2, subdivision (e) provides "the juvenile court which has jurisdiction of the dependency action shall have exclusive jurisdiction" over a Family Code section 7630 action. Moreover, the statute further provides: "Nothing in this section shall preclude a court from terminating a father's parental rights even if an action has been filed under Section 7630 or 7631 of the Family Code." (§ 316.2, subd. (b).) Together, these provisions ensure the

predominance of the dependency laws in the event an action to establish a parent-child relationship action converges with a dependency proceeding. Therefore, even if Joshua files a Family Code section 7630 action, his lack of presumed father status will serve to deny him both services and custody within this dependency proceeding. (*In re Zacharia, supra,* 6 Cal.4th at p. 451.) Paternity is simply not relevant here, with or without the filing of a Family Code section 7630 action.

Finally, Joshua challenges the denial of paternity testing as harmful to the minor's interests. His argument is based on the premise that paternity is "always relevant" in dependency proceedings. He argues that in the absence of either competing claims for paternity or an adoptive placement, "identifying the father of a child provides many social, medical, and financial advantages[,]" and "is in [the child's] best interests." He concludes the court abused its discretion in denying paternity testing because it leaves the minor "fatherless"—a result that "cannot be in [the minor's] best interests."

This argument concedes paternity testing was a matter within the discretion of the juvenile court. (We have already determined the criteria for *mandatory* testing upon motion by the alleged father were unmet here.) As such, our review of the court's ruling is limited to determining whether the court abused that discretion. " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [7 Cal.4th 724a, 27 Cal.Rptr.2d 595, 867 P.2d 706].)

 Implicit in the court's denial of paternity testing is the determination that the minor would not benefit from having Joshua identified as his father. We must decide whether that determination "can reasonably be deduced from the facts." (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318-319.)

The relevant facts begin with Joshua's discovery he was an alleged father of the minor, who was then 17 months old. Rather than request paternity testing, Joshua formally denied paternity and relinquished any claim to family reunification services or notice of further dependency hearings. Six months later, he had a change of heart. He acknowledged the possibility he was the minor's father, and promised SSA he would make the minor a priority in his life once he was out of prison. He never made good on that promise. He repeatedly declined to be transported from prison to any of the dependency hearings concerning the minor; he even neglected to show up at

the crucial section 366.26 permanency/section 388 petition hearings that took place after he was released from prison. In the year between his release and reincarceration, he never sought visitation or custody, never provided financial support, and made no effort to establish a relationship with the child.

Joshua wants us to overlook this sad history, arguing the two previous dependency proceedings are not relevant to this appeal. He asserts this third dependency petition initiated an original proceeding which "started the clock over." Though the "clock" may have started over, the past does not disappear. In determining whether a paternity test would serve the minor's best interests, the juvenile court had to consider whether Joshua has demonstrated a real commitment to the child's welfare. Undeniably, he has not. Particularly relevant to that determination is the evidence of Joshua's persistent failure to seek visitation or custody, to provide financial support, or to participate in dependency hearings so crucial to the minor's present and future well being. Given this record, we cannot say the court exceeded the bounds of reason in concluding the minor would reap no benefit from allowing Joshua a paternity test.

■ As for Joshua's assertion that biological paternity is always relevant and a decision that leaves a child "fatherless" is necessarily harmful, California courts see it otherwise. Case law holds that mere *biological* fatherhood, unaccompanied by a parent-child *relationship*, is worth little in the dependency context.

In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 838 [4 Cal.Rptr.2d 615, 823 P.2d 1216], the California Supreme Court articulated this view well: "[The] biological connection between father and child is unique and worthy of constitutional protection *if* the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (Italics added.) In a later decision, the court put it in starker terms: "[I]nterpreting 'parent' to include a strictly biological father would introduce into the dependency context fathers who had never demonstrated any commitment to the child's welfare. [Citation.] Indeed, such an interpretation would arguably grant 'reunification services to a rapist or an anonymous sperm donor.' [Citation.]" (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.)

Joshua is within the category of those the Supreme Court found unworthy of the term "parent": "fathers who had never demonstrated any commitment to the child's welfare. [Citation.]" (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.) We conclude the court did not abuse its discretion in denying his request for paternity testing.

## DISPOSITION

The judgment is affirmed.

Aronson, J., and Moore, J., concurred.