[No. H038322. Sixth Dist. Oct. 24, 2012.]

In re D.M., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Appellant, v.
J.J., Defendant and Respondent.

**COUNSEL**

Lori E. Pegg, Acting County Counsel, Teri L. Robinson, Lead Deputy County Counsel, and Hilary T. Kerrigan, Deputy County Counsel, for Plaintiff and Appellant.

Linda K. Harvie, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION

**PREMO, J.**—D.M., the third child of V.S. (mother), was taken into protective custody directly from the hospital where he was born. The juvenile court sustained a petition filed by the Santa Clara County Department of Family and Children's Services (the Department) pursuant to Welfare and Institutions Code section 300, finding that D.M. came within the jurisdiction of the juvenile court. The juvenile court also found that mother's boyfriend, respondent J.J., who is not D.M.'s biological father, is not married to mother, and cannot satisfy the statutory presumptions of paternity set forth in Family Code section 7611,[1] is nevertheless the presumed father entitled to reunification services because he has done everything a biological father might have done under the circumstances "to develop a bond" with the child. The Department appeals, asking us to reverse the presumed father declaration and the order for services to J.J.

We conclude that, although J.J. may have done everything he could under the circumstances to be a father to D.M., he must also demonstrate that he has an existing familial bond with the child sufficient to warrant giving him rights equal to those afforded a biological mother. Because the record does not support this essential element, we shall reverse and remand the matter to allow the court to reconsider the issue if J.J. desires to reassert his claim.

## I. *Legal Framework*

■ Dependency law recognizes four types of fathers: alleged, de facto, biological, and presumed. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123], review granted May 1, 2002, S104863, opn. ordered pub. June 6, 2002 (*Jerry P.*).) Only a presumed father is entitled to appointed counsel, custody (if there is no finding of detriment) and reunification services. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209 [34 Cal.Rptr.3d 215].) A biological father who is not a presumed father may be granted services but it is not mandatory. (Welf. & Inst. Code, § 361.5, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

To be a statutorily presumed father a man need not be the child's biological father but he must fit at least one of the categories of section 7611. Under section 7611 a man is presumed to be the father if he made a voluntary declaration of paternity (§ 7570 et seq.) or is a nonsterile husband who cohabited with the mother at the time of conception (§ 7540 et seq.). A man may also be the presumed father in four additional circumstances described by subdivisions (a) through (d) of section 7611: "(a) He and the child's

---

[1] Hereafter all unspecified statutory references are to the Family Code.

natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated . . . . [¶] (b) Before the child's birth, he and the child's natural mother have attempted to marry . . . . [¶] . . . [¶] (c) After the child's birth, he and the child's natural mother have married, or attempted to marry . . . . [¶] . . . [¶] (d) He receives the child into his home and openly holds out the child as his natural child."[2]

There are some circumstances where a man with no marital relationship to the mother, and who has not received the child into his home, may be declared a presumed father under principles of due process and equal protection if he has been prevented by the mother or by third parties from physically receiving the child into his home. (*In re Julia U.* (1998) 64 Cal.App.4th 532 [74 Cal.Rptr.2d 920] (*Julia U.*); *Jerry P., supra*, 95 Cal.App.4th 793.) We shall consider the circumstances under which this exception applies in our discussion below.

## II. *Background*

J.J. and mother have never been married or attempted to marry. J.J. met mother shortly after she became pregnant with D.M. He moved in with her about three months before D.M. was born. Mother told the Department that D.M.'s biological father was "Earl." She did not know his last name and could not find out because he had moved away. Mother had only a brief relationship with Earl; it ended shortly before she got together with J.J.

D.M. was born in February 2012 when mother was 19 years old. Hospital social workers contacted the Department, describing concerns about mother's "not showing proper bonding." She had not sought prenatal care until late in her pregnancy and was alleged to have hidden the pregnancy from her social worker. Mother's parental rights to her first child had been terminated in 2009. At the time of D.M.'s birth, mother had an open dependency case involving a second child and the Department was recommending terminating reunification services in that case as well.

D.M. was taken into protective custody directly from the hospital. The Department's petition (Welf. & Inst. Code, § 300, subds. (b) & (j)), filed when D.M. was just two days old, cited as bases for jurisdiction mother's behavior in the hospital, her history of abuse and neglect of her two older

---

[2] The code sections applicable to determining father-child relationships are used to determine mother-child relationships as well, "[i]nsofar as practicable." (§ 7650, subd. (a); see *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 119–120 [33 Cal.Rptr.3d 46, 117 P.3d 660] (*Elisa B.*).) Because our case involves a claim to presumed fatherhood, we use the masculine pronoun and refer only to fathers.

children, concerns about her mental health, and the fact that the trailer in which she lived was previously found to be unsanitary and unsafe.

Mother and J.J. were present at the initial hearing. The juvenile court ordered D.M. detained and directed the Department to provide mother with a minimum of two two-hour supervised visits every week. The court gave the social worker discretion to allow visits with J.J. The court set a hearing for March 12, 2012, for determination of jurisdiction and appointment of counsel for J.J. who claimed paternity rights.

At the March 12 hearing, mother and J.J. were again present. The court appointed counsel for J.J. and continued the jurisdictional hearing. Reunification services had recently been terminated in the case of mother's second child and the Department wanted the opportunity to consider asking the court to bypass services in this case.

Prior to the jurisdictional hearing, J.J. filed a statement regarding parentage in which he stated that he believed he was D.M.'s parent and asked the court to enter a judgment to that effect. J.J. claimed that he had been with mother "since one week of pregnancy" and that he had remodeled her house to get it ready for the baby, attended all of mother's prenatal appointments, and had been visiting the baby regularly. Mother and D.M.'s counsel supported J.J.'s request. The Department opposed it, pointing out that J.J. had not signed a voluntary declaration of paternity when the baby was born, was not named on the birth certificate, and could not meet any of the statutory requirements for presumed father status.

Although concerned about mother's ability to internalize the services she had received in conjunction with the previous two dependency cases, the Department decided not to recommend bypassing services in this case. Inspection of mother's home on February 28, 2012, revealed that the Department's cleanliness and safety concerns had been addressed. The home was "neat and tidy" with no evidence of dog feces that had been present in the past. There was a security gate separating the kitchen from the living room area, a bed in a separate room for mother's second child when he visited, and a crib in mother's room for D.M. Visitation with D.M. had been going well. Mother and J.J. had been consistently visiting and visits had been uneventful. Mother and J.J. took turns holding the baby and were able to provide basic care such as feeding, burping, and diapering. D.M. was healthy. He had no apparent developmental delays. He had a calm, even temperament and was thriving in his foster home. His foster parents were willing to adopt him should reunification efforts fail.

The Department's report for the jurisdictional hearing noted that J.J. had expressed his intent to support mother in this case. He was looking for work

but was finding it difficult due to his criminal background.[3] J.J. had a son of his own who had been placed with a maternal grandparent. Although J.J. said he wanted to obtain custody of that child, he had not taken any steps to accomplish that. The social worker did not question J.J.'s commitment to mother and D.M. but speculated that resentment related to his inability to establish a relationship with his biological son "may be the reason why [J.J.] believe[s] that it is his responsibility to be father to [D.M.]." The social worker believed that the enthusiasm and desire that J.J. had expressed with regard to mother and D.M. would be better directed to his dealings with his biological child.

The Department's recommendation was that mother receive reunification services, including a psychological evaluation, and that no services be provided to J.J. In an addendum report submitted just prior to the jurisdiction/disposition hearing, the Department revealed that A.S., a nonrelated extended family member, was willing to have D.M. placed with her and was also willing to adopt him should reunification efforts fail. Her home had been identified as appropriate for placement and would be the least restrictive environment for the child, allowing mother and J.J. to comfortably interact with D.M. during visits. The Department continued to oppose offering reunification services to J.J.

J.J.'s parentage petition was heard in conjunction with the jurisdiction and disposition hearing on April 11, 2012. J.J. testified that he had met mother a few days after she found out she was pregnant. They began dating and he moved in with her in November 2011. J.J. went to mother's prenatal doctor's appointments with her, talked to the doctors, and voiced his opinions and concerns. It did not matter to him that he was not D.M.'s biological father. He has a "very, very close" relationship with mother and through her pregnancy he began an attachment to D.M. "even through her stomach." J.J. lives with mother in her trailer. He and she have prepared the home, cleaned it, redecorated it, and made it child safe. J.J. bought a lot of diapers, wipes, clothes, formula, bottles, and bedding for the baby.

J.J. took mother to the hospital to deliver the baby; hospital staff told him that she would have the baby by caesarean section, which was scheduled for a certain time. J.J. had somewhere "very important" he needed to be, so he left, intending to return in time for the birth, but "they moved her C-section like hours earlier" so that he was not there when the baby was born, although

---

[3] J.J. has two felony convictions: carjacking (Pen. Code, § 215) in 2003 and taking a vehicle without consent (Veh. Code, § 10851, subd. (a)) in 2007. He also has several misdemeanor convictions, the most recent of which were December 2011 convictions for driving without a license and hit and run with property damage (*id.*, §§ 12500, subd. (a), 20002, subd. (a)).

he arrived shortly thereafter. He held the baby in the hospital. He did not sign a voluntary declaration of paternity because no one offered him such a document.

In the two months since D.M. was born, J.J. visited him twice a week for two hours each time. He believes that the baby already recognizes him, smiles at him, laughs, giggles, and loves for J.J. to hold him. J.J. has told most of his family that D.M. is his son. They understand that D.M. is not J.J.'s biological child but that J.J. intends to adopt him as his own. He has asked that D.M. come to live with him but he understands that the child has been removed from mother's custody because of her inability to reunify with her older children.

Taking into account all of the Department's reports and J.J.'s testimony, the juvenile court concluded that J.J. had standing to seek presumed father status even though he was not the biological father and D.M. had never lived in his home. The court believed the question was "one of degree." Had J.J. done enough and presented enough evidence to establish the foundational requirements of a section 7611, subdivision (d) presumption of fatherhood? Relying upon *Jerry P., supra*, 95 Cal.App.4th 793 and *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932] (*Nicholas H.*), the juvenile court concluded that J.J. had "proved by a preponderance of the evidence that he received the child into his home as far as he could under the circumstances of this particular case and that he openly and has openly held out the child as his natural child." That was enough, in the court's view, to entitle him to the presumption that he is the child's natural father.

The juvenile court cited the evidence upon which it relied for the finding, which was that J.J. had begun preparing and helping to provide for the child before birth. He had supported mother throughout her pregnancy and continued to do so. He arrived at the hospital as quickly as he could after the child was born and took him into his arms. He did not take him home because "circumstances prevented that from occurring." J.J. appeared at the initial hearing and as best he could "sought to inform the Court of his desire to be deemed the presumed father." He sought the right to visit the baby and has been visiting consistently. "In the Court's view he has done all of the things that a biological father under the circumstances might do to develop a bond in a relationship with this child."

The juvenile court recognized that a lingering question was J.J.'s motivation. Was it solely due to his love of D.M. or was it to some extent connected to his relationship with mother? The court did not believe the question could be fully answered at that point and found J.J. was believable when he stated his desire to be there for D.M. regardless of the circumstances and for all

time. The court recognized that at a different point in time the result might be different "but up to this point the evidence before me leads me to believe by a preponderance of the evidence that he is the legally presumed father."

The court sustained the petition, ordered D.M. placed with A.S., and directed the Department to provide reunification services to mother and J.J. and to arrange for visitation for a minimum of two hours twice a week for both of them. The Department has filed this timely appeal.

## III. *Discussion*

### A. *Issues and Standards of Review*

The Department argues that J.J. cannot qualify as a presumed father under section 7611 and that the juvenile court applied an inappropriate analysis for determining nonstatutory presumed father status. We review the first contention for substantial evidence. (*In re Cheyenne B.* (2012) 203 Cal.App.4th 1361, 1371 [138 Cal.Rptr.3d 267].) Analysis of the nonstatutory basis for presumed father status is a legal determination subject to our independent review. (Cf. *ibid.*)

### B. *J.J. Is Not a Statutorily Presumed Father*

We agree with the Department that J.J. cannot qualify as a presumed father under section 7611. J.J. did not sign a voluntary declaration of paternity, he never married or attempted to marry mother, and he never received D.M. into his home.

J.J. argues that he may be deemed a statutorily presumed father under section 7611, subdivision (d) because some courts have allowed father-child visits to qualify as receiving the child into the home. The cases he cites do not support his argument. In *In re A.A.* (2003) 114 Cal.App.4th 771, 784 [7 Cal.Rptr.3d 755], the nonbiological father had held the child out as his own. The child did not live with him on a full-time basis, but the man had received her into his home because she visited him there as children often do when parents do not live together. In contrast, the biological father visited the child but those visits were in other people's homes. "By visiting the minor at the maternal grandmother's home and at his parents' home, [the biological father] could avoid the constant parental-type tasks that come with having the child in his own home—such as feeding and cleaning up after the minor, changing her clothing, bathing her, seeing to her naps, putting her to bed, taking her for outings, playing games with her, disciplining her, and otherwise focusing on the child." (*Id.* at pp. 786–787.) These facts did not warrant

finding the biological father had received the child into his home; accordingly, he was not entitled to presumed father status under section 7611, subdivision (d). (*In re A.A., supra*, at p. 788; see *In re Cheyenne B., supra*, 203 Cal.App.4th 1361 [evidence of occasional visits only did not warrant finding man to be presumed father under § 7611, subd. (d)].) Here, too, J.J.'s supervised two-hour court-ordered visits with D.M. are insufficient to show that he received the child into his home. He has no statutory claim to presumed fatherhood.

### C.   *The* Jerry P. *"Equitable Father" Analysis*

If J.J. has any claim to presumed father status it rests exclusively upon *Jerry P., supra*, 95 Cal.App.4th 793, in which the appellate court held that some unwed, nonbiological "fathers" have a constitutional right to be declared presumed fathers in a dependency case. In order to understand *Jerry P.*, we must first look to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), upon which the *Jerry P.* case relied.

In *Kelsey S.*, the biological father, who was not married to the mother, could not be a statutorily presumed father because he could not prove that he had taken the child into his home; the mother had prevented him from doing so. Since only statutorily presumed fathers had authority under the adoption statutes to consent (or withhold consent) to the adoption of their children, the biological father had no say in the mother's decision to release their child for adoption. The Supreme Court concluded that the adoption statutes violate the biological fathers' right to due process and equal protection of the law to the extent that they permit the mother to unilaterally preclude her child's biological father from being a presumed father. (*Kelsey S., supra*, 1 Cal.4th at p. 849.) "In constitutional terms, the question is whether California's sex-based statutory distinction between biological mothers and fathers serves ' ". . . important governmental objectives and [is] *substantially related* to achievement of those objectives." ' [Citation.] Does the mother's ability to determine the father's rights substantially serve an important governmental interest? The question is the same 'whether the analysis [is] undertaken as a matter of due process or equal protection.' " (*Id.* at p. 844.)

*Kelsey S.* explained that the disparate treatment was not substantially related to the identified governmental interest of protecting the child's best interests. "The child has a genetic bond with its natural parents that is unique among all relationships the child will have throughout its life. 'The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility.' [Citation.] It therefore would be curious to conclude that the

child's best interest is served by allowing the one parent (the mother) who wants to sever her legal ties to decide unilaterally that the only other such tie (the father's) will be cut as well. Absent a showing of a father's unfitness, his child is ill-served by allowing its mother effectively to preclude the child from ever having a meaningful relationship with its only other biological parent." (*Kelsey S., supra*, 1 Cal.4th at p. 848, quoting *Lehr v. Robertson* (1983) 463 U.S. 248, 256 [77 L.Ed.2d 614, 103 S.Ct. 2985].)

*Kelsey S.* concluded, "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

*Kelsey S.* was extended to dependency proceedings in *Julia U., supra*, 64 Cal.App.4th 532, where an unmarried biological father challenged orders denying him reunification services and terminating his parental rights. The *Julia U.* court concluded that in a dependency case, if an unwed biological father "comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at pp. 540–541.) *Julia U.* listed the factors the juvenile court should consider: "In determining whether a biological father has demonstrated such commitment, the father's conduct both before and after the child's birth must be considered. [Citation.] Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. [Citation.] In particular, the father must demonstrate a willingness himself to assume full custody of the child—not merely to block adoption by others. [Citation.] A court should also consider the father's public acknowledgment of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child." (*Id.* at p. 541, citing *In re Zacharia D., supra*, 6 Cal.4th at p. 450, fn. 19 & *Kelsey S., supra*, 1 Cal.4th at p. 849.)

*Kelsey S.* and *Julia U.* set the stage for *Jerry P.* In *Jerry P.*, J.R. had had a one-year unmarried relationship with the child's mother during which the child was conceived. J.R. assumed the baby was his. J.R.'s relationship with the mother ended before the child's birth but he continued to support her during the pregnancy. (*Jerry P., supra*, 95 Cal.App.4th at p. 797.) When the

child was born, J.R. visited him in the hospital every day but then lost track of him in the foster care system for many months. Once he located the child, J.R. sought and eventually received permission to visit him and, thereafter, visited regularly and often, took the child on outings with the foster mother, and between visits called the foster mother to check on the child's well-being. (*Id.* at p. 798.) The juvenile court did not rule upon J.R.'s presumptive father claim until after J.R. had been afforded approximately 10 months of visits with the boy. By then, the child was about 18 months old. He referred to J.R. as "daddy" and was obviously attached to him. (*Id.* at pp. 798–799, 806.) The foster mother testified that J.R. was " 'extremely dedicated' " to the child and even the social worker reported that the child was " 'in the elementary stages of bonding with *his father* and is secure and comfortable in *his father's* care.' " (*Id.* at p. 799.) Nevertheless, the juvenile court refused to declare J.R. to be the presumed father because the man had never physically taken the child into his home. The juvenile court did not reach the question whether J.R. was also disqualified because he was not the biological father. (*Id.* at pp. 810–811.)

*Jerry P.* held that the *Kelsey S.* reasoning was applicable in dependency cases since the dependency statutes set up the same kind of disparate treatment the adoption statutes created. (*Jerry P., supra,* 95 Cal.App.4th at p. 812.) That is, a biological father could have his parental rights terminated solely by the acts of others over whom he had no control. *Jerry P.* went a step further, holding that the analysis applied to nonbiological "fathers" as well. *Jerry P.* called such a father an " 'equitable father' " entitled to all the rights and obligations of a presumed father. (*Id.* at p. 813.) The court framed the issue as one of standing: "[D]oes a nonbiological father have a constitutionally sufficient interest in his relationship with the child to be entitled to reunification services on the same basis as a '*Kelsey S.* father'?" (*Id.* at p. 816.) *Jerry P.* concluded, ". . . *Kelsey S.* protection should extend to men such as J.R. who have demonstrated their commitment to parental responsibility by meeting the conditions set forth in that opinion, none of which depends on biology." (*Ibid.*)

   D.   *An "Equitable Father" Must Demonstrate an Existing Familial Bond*

   The Department argues that the *Jerry P.* analysis is flawed in that it overlooked the fundamental difference between its case and the facts of *Kelsey S.*, namely, the absence of a biological tie between the alleged father and the child. The Department maintains that under *Jerry P.*, "an unrelated person of any gender, sharing no biological tie with the child, can claim a constitutional right to parenthood if prevented by the biological mother from developing a familial relationship with that child." We do not read the case so broadly.

As *Jerry P.* noted, the *Kelsey S.* conditions—i.e., that the man promptly come forward and demonstrate a full commitment to his parental responsibilities—do not depend upon biology. (*Jerry P., supra*, 95 Cal.App.4th at p. 816.) But those conditions, as described by both *Kelsey S.* and *Julia U.*, presumed the existence of a biological relationship between the alleged father and child. It was the existence of the biological relationship that warranted consideration of the man as a presumed father. The biological father had a constitutional right to parent the child so long as he came forward promptly and did all he could to assert the right. To apply the same analysis to any unrelated man would be a distortion of the *Kelsey S.* reasoning. *Jerry P.* implicitly recognized that the first step in the analysis is proof of an existing familial relationship between the alleged father and child. In *Kelsey S.* and *Julia U.* the familial relationship was biological. In *Jerry P.*, it was social.

■ We do not read *Jerry P.* as holding that the constitutional right to assert paternity extends to any man who comes forward promptly. *Jerry P.* began its analysis of the constitutionality of section 7611 in the dependency context by noting, "The evidence in this case leaves no doubt J.R. established a father-son relationship with Jerry before his birth and that this relationship continued through the hearing on J.R.'s presumed father status." (*Jerry P., supra*, 95 Cal.App.4th at p. 806.) It was this existing father-son relationship that *Jerry P.* found sufficient to trigger constitutional protection. It is the parental relationship that warrants protection, not the mere desire to parent a child. As the *Jerry P.* court explained, in the dependency context the presumed father analysis is "used to identify a preferred class of fathers by reference to the familial bonds described in section 7611 which the Legislature has determined reasonably approximates the class of fathers it wishes to benefit." (*Id.* at p. 805.) *Jerry P.* was careful to describe the constitutional interest as the man's interest in "*maintaining* his relationship with the child." (*Id.* at p. 815, italics added.)

■ Section 7611, subdivision (d), from which both *Jerry P.* and *Kelsey S.* were derived, requires something more than a man's being the mother's casual friend or long-term boyfriend; he must be "someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being" regardless of his relationship with the mother. (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1085 [136 Cal.Rptr.3d 339].) In our view, whether the man seeks presumed father status under section 7611, subdivision (d) directly, or under the rule of *Jerry P.*, he must demonstrate that he falls within the class of fathers described by the Legislature in section 7611, a classification that distinguishes "between those fathers who have entered into some familial relationship with the mother and child and those who have not." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708 [266 Cal.Rptr. 274].)

In short, we presume a person is a child's father, notwithstanding the absence of a biological connection, in order to protect a developed familial relationship. Although a man with no biological connection to the child, no marital connection to the mother, and no way to satisfy the statutory presumption of paternity may nevertheless be deemed a presumed father, he must do more than simply show that he has done all he can under the circumstances to assert a right to parent. He must prove that he has an existing familial relationship with the child such that his rights deserve the same level of protection as those of a biological mother. (Cf. *Kelsey S., supra,* 1 Cal.4th at p. 849.) A biological father is not entitled to custody or to reunification services merely because he wants to establish a personal relationship with his child. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160 [6 Cal.Rptr.3d 197].) Likewise, an unmarried man who is not biologically related to the child is not entitled to custody or to reunification services merely because he wants to be the parent.

The presence of a parental relationship will often be easy to prove. As one court explained, the reason it is not necessary that a presumed father be the biological father "is because a presumed father, who has lived with a child and treats the child as a son or daughter, has developed a parent-child relationship that should not be lightly dissolved. This type of familial relationship is much more important, at least to the child, than a biological relationship of actual paternity." (*In re P.A.* (2011) 198 Cal.App.4th 974, 980 [130 Cal.Rptr.3d 556], citing *Nicholas H., supra,* 28 Cal.4th at p. 65.) But where the child is a newborn detained within days of his birth, a man with no biological relationship to the child and no marital relationship with the mother will be hard pressed to prove an existing familial tie to the child. He may develop such a relationship over time, as happened in *Jerry P.* But we doubt that such a relationship springs full-blown from the womb. (Cf. *Lehr v. Robertson, supra,* 463 U.S. at p. 260 [" '*Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*' "].)

E.   *The Interest in Providing a Child with Two Parents Is Not a Factor Unless the Evidence Supports the Presumption of Parenthood*

We recognize that one important policy concern is ensuring that children have two parents. Here, D.M.'s counsel supported J.J.'s request for presumed father status for that reason. But reliance upon the policy favoring two parents is misplaced if it comes before an accurate finding of parenthood.

Section 7612, subdivision (a) provides that the presumptions arising under section 7611 "may be rebutted in an appropriate action." In *Nicholas H.,*

*supra*, 28 Cal.4th at page 70 and *Elisa B., supra*, 37 Cal.4th at page 123, the Supreme Court held that it is not an appropriate action for rebutting the presumption of parenthood under section 7611, subdivision (d) when to do so would leave the children with only one parent. "By recognizing the value of determining paternity, the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support, especially when the obligation to support the child would otherwise fall to the public." (*Elisa B., supra*, at p. 123; see *Librers v. Black* (2005) 129 Cal.App.4th 114, 123 [28 Cal.Rptr.3d 188] ["[W]henever possible, a child should have the benefit of two parents to support and nurture him or her."].)

■ In both *Nicholas H.* and *Elisa B.*, the presumed parents had undisputed, statutorily presumed parent status. One need not decide whether an action is appropriate to rebut the presumption of parenthood unless the evidence supports the presumption in the first place. As one commentator has written: "If parentage findings in dependency cases are to be meaningful and not subject to later dispute when another possible parent emerges, all parties must ensure that the process used by the court to determine parentage in each case is as thorough as the circumstances of the case dictate, and as accurate as reasonably possible." (Seiser & Kumli, Cal. Juvenile Courts Practice and Proc. (2012) § 2.60[6], p. 2-123.) The well-intentioned desire to provide a child with two parents does not trump the need to make sure that the persons we designate actually are the parents. Where, as here, there is an unknown biological father who may have an interest in parenting his biological child if he knew he had one, a precipitous finding that an unrelated man is the presumed father has a potential for mischief that could well be contrary to the best interests of the child.

F.  *The Juvenile Court Did Not Focus upon Familial Bonds*

■ In applying the *Jerry P.* analysis in this case, the juvenile court focused upon the fact that J.J. came forward promptly and has done everything he could do in the first two months of the baby's life to "develop a bond" with D.M. There is substantial evidence to support that finding and we need not recite it here. But the court did not find that there was an existing father-son relationship between J.J. and D.M., without which J.J. cannot be a presumed father. Indeed, the juvenile court's observation that J.J. had done what he could to "develop" a bond with the baby, and its recognition that the presumed-father finding could be different in the future, suggest that the court considered only the possibility that J.J. would develop a parental relationship with the child, not that the relationship already existed.

Accordingly, we shall reverse the juvenile court's order declaring J.J. to be the presumed father of D.M. Reversal of that order necessarily requires

reversal of the order affording J.J. reunification services since only the presumed or biological father may receive services. (Welf. & Inst. Code, § 361.5, subd. (a).) Reversal does not affect the juvenile court's orders pertaining to visitation. And reversal shall be without prejudice to the juvenile court's reconsideration of the issue should J.J. desire to renew his request.

## IV. *Disposition*

The order of the juvenile court declaring respondent J.J. to be the presumed father of the minor D.M. and ordering appellant Department of Family and Children's Services to provide reunification services to him is reversed. This disposition is without prejudice to J.J.'s making another request for presumed father status.

Rushing, P. J., and Elia, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 3, 2013, S207019.