Filed 4/25/13  In re K.F. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | B243454 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK39018) |
| Plaintiff and Respondent, | |
| v. | |
| CALVIN G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Reversed and remanded with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Calvin G. appeals from juvenile court orders denying his request for presumed father status and terminating parental rights as to his biological daughter, K.F. He argues the court violated his due process rights as a parent. He also argues that the Los Angeles Department of Children and Family Services (the Department) failed to comply with inquiry and notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq., ICWA). We find no due process violation of father's parental rights, but we conclude that information provided by father was sufficient to trigger the inquiry and notice requirements of ICWA and remand for that purpose.

**FACTUAL AND PROCEDURAL SUMMARY**

K.F. was born to mother, M.F., on September 28, 2011. The next day, the Department received a referral claiming that the infant girl was a victim of general neglect. The staff of the hospital where mother and child were admitted expressed concern to the Department about mother's ability to care for K.F. Mother had told them that her parental rights as to her two older children had been terminated due to her substance abuse and mental health issues. A social worker visited mother in the hospital. Mother was upset and hostile, and claimed that the worker assumed she was using illegal substances because of her history. Mother said she had been diagnosed with Schizoaffective Disorder in 2000. She last saw a psychiatrist in early 2010. She stopped taking her medication during her pregnancy with K.F. to protect the baby. She said she had a history of using marijuana, cocaine, and alcohol, and had been arrested in 2008 for drug possession. Mother refused to provide the name of K.F.'s father. Mother refused to sign a safety plan for K.F. A nurse and a physician reported mother had not fed K.F. as scheduled, placing the baby at risk of dehydration. She also let the child cry and interfered with the efforts of nurses to care for the baby, including preventing them from taking the baby to be washed and cleaned. Mother tested negative for drugs at the hospital. The child was placed in protective custody. The Department confirmed that mother's parental rights to her two older children were terminated because of her mental health and substance abuse issues.

The Department filed a petition on behalf of K.F. under Welfare and Institutions Code section 300[1] based on mother's loss of rights as to her two older children, and her continuing substance abuse and mental health problems. At the detention hearing, mother identified Calvin G. as the father of K.F., but said she did not know where he was. She did not know whether he had Indian ancestry, but said she did not. She said father came to the hospital the day K.F. was born. The court found him to be an alleged father. The child was detained. In the event that father contacted the Department, the court said it would allow him monitored visitation.

A first amended dependency petition was filed in November 2011, naming Calvin G. as father of K.F. It alleged that father had a history of substance abuse, including cocaine, which rendered him unable to care for the child and endangered the child's physical and emotional health and safety, placing the child at risk of harm. In the jurisdiction/disposition report, the Department reported that father had a burglary conviction in 1974, a fine for obstruction of justice in 1978, probation arising out of a fight in public in 1982, a fine for failure to appear on a charge of possession of a controlled substance in 1999, and unspecified municipal code infractions in 2004. In addition, between 1974 and 2011, he had one arrest for indecent exposure, one for lewd crimes against children, eight for narcotics-related charges and eight for spousal abuse or assault.

Father was reluctant to "get the mother in trouble," when interviewed by the Department, but said she had anger issues. He thought K.F. would be "'okay'" if returned to mother, if mother takes her medication. Aside from mother's anger, he had not observed any mental health symptoms in mother. Father had told mother he wanted a paternity test. When they spoke by telephone a few days after K.F. was born, mother did not tell him about the Department's involvement. Father tested positive for cocaine on November 2, 2011. He wanted K.F. to be placed in his care.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Father first appeared on November 16, 2011. At the hearing he filed a parental notification of Indian status form, indicating that he may have Indian ancestry in the Cherokee tribe through his grandmother, who was not herself a tribe member but who had Cherokee roots. The court found that ICWA did not apply. Father requested presumed father status. To facilitate that request, he asked for a DNA test to prove his paternity. The court ordered a paternity test, which established that he is K.F.'s biological father.

Father failed to appear at the adjudication hearing. The first amended petition was sustained as alleged. The court postponed ruling on father's renewed request for presumed father status until the next hearing. Father also failed to appear for the contested dispositional hearing. He told a dependency investigator that he had not submitted to drug and alcohol tests because he had been out of state for a few weeks and had just returned in early January 2012. Father said he had not enrolled in any programs recommended by the investigator, such as substance abuse and parenting classes because no programs had been ordered by the court. The Department asked that father not be given family reunification services because he was an alleged father and had not attained presumed father status. In addition, father had never visited the baby. Counsel for K.F. joined with the Department in requesting that father not receive reunification services because he had done nothing to change his status and had not visited the child. The juvenile court declared K.F. a dependent of the court. Reunification services were denied to father because his status was that of alleged father, not presumed father. A permanency planning hearing was set for May 4, 2012. Father appeared at that hearing, which was continued for proper notice to mother.

On May 7, 2012, father filed a section 388 petition, asking the court to declare him the presumed father of K.F., order home reunification services, and place the child in the home of a paternal cousin. Father said that "unbeknownst to counsel" he had regularly been visiting K.F. For the first time, father filled out a Judicial Council form JV-505, Statement Regarding Parentage. He checked boxes on the form asking for appointment

4

of counsel,[2] stating that he believed he is K.F.'s parent and requesting a judgment of parentage or presumed father status. Father also asked the court to find that he is the presumed parent. The form provides spaces to indicate that the child had lived with father, listing persons that father had told that K.F. was his, and listing activities with the child. All of these were left blank except father listed visitation as an activity with K.F.

The Department opposed the section 388 petition on the grounds that no changed circumstances were demonstrated. In addition, counsel for the Department represented that father had not visited K.F., contrary to father's claim.[3] The court agreed, finding no visitation and no changed circumstances. The petition was summarily denied.

The Department recommended termination of parental rights. At the request of parents, a contested section 366.26 permanency planning hearing was held. The parties stipulated that if father was called to testify, he would state that he was unable to visit because the social worker and caregiver had not helped facilitate visits. Father objected to termination of his parental rights, claiming the parental relationship exception of section 366.26, subdivision (c)(1)(B)(i) since he had unsuccessfully tried to visit K.F.

The court found by clear and convincing evidence that K.F. is adoptable and that it would be detrimental to return her to her parents. The court found that no exception to adoption applied. Father and mother's parental rights were terminated. K.F.'s custody was transferred to the Department for adoptive planning and placement. Father filed a timely appeal from the order terminating his parental rights and the July 6, 2012 order denying his request for presumed father status.

---

[2] Father had been represented by counsel at all previous hearings.

[3] The record is inconsistent regarding father's visits with K.F. A status review report prepared for July 6, 2012 stated that father participated in monitored visits after K.F. was detained for approximately two hours each visit, but that he had requested few visits with the child after January 9, 2012. On June 13, 2012, the caregiver reported that father had one visit on May 4th, but had not appeared for other visits.

5

I

"Dependency law recognizes four types of fathers: alleged, de facto, biological, and presumed. [Citation.] Only a presumed father is entitled to appointed counsel, custody (if there is no finding of detriment) and reunification services. [Citation.] A biological father who is not a presumed father may be granted services but it is not mandatory. (Welf. & Inst. Code, § 361.5, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 451.)" (*In re D.M.* (2012) 210 Cal.App.4th 541, 544 (*D.M.*).) To attain status as a presumed father, a man must fit within one of the categories of Family Code section 7611. The only one available to father here was to receive the child into his home and openly hold her out as his natural child. (Fam. Code, § 7611, subd. (d).) Here, father remained an alleged father throughout these proceedings; he never attained presumed father status.

Father argues he "did everything he could to demonstrate his full commitment to his parental responsibilities in order to qualify as a presumed father so that he may be given the opportunity to regain custody of K.F." He cites his one visit to the hospital when the child was born, at which point he told mother that he would assume responsibility for the child after a paternity test established he was the parent. He also cites his appearance at the first hearing after the petition was filed, at which time he requested a paternity test. He claims that as "an unwed biological father who promptly came forward and demonstrated a commitment to K.F.," his parental rights should not have been terminated absent a showing of his unfitness as a parent, citing *In re Julia U.* (1998) 64 Cal.App.4th 532, 540–541 (*Julia U.*).

That case is distinguishable. In *Julia U.*, only after the first alleged father was eliminated by paternity testing did mother identify Ramon O. as an alleged father. They were not married and had a casual relationship involving sexual intercourse only twice. He believed another man was the biological father. There was a three-month delay before the social services department notified the court that the first alleged father was not the biological father. It took two more months for the department to contact Ramon

6

after mother first identified him. Ramon consistently expressed his desire for a relationship with the child if paternity testing showed he was the biological father. The child services department delayed the paternity testing for Ramon for three to four months and denied him visitation with the child in the meantime. He was not appointed counsel before the delayed test. At the department's request, the court in *Julia U.* terminated all reunification services two to three months before the paternity test was performed. The trial court set a section 366.26 hearing on the same day Ramon first appeared in court and paternity testing was ordered. The court did not give Ramon an opportunity to establish his right to paternity or to prove his presumed father status. The Court of Appeal found Ramon's due process rights were violated when the court terminated reunification services before it considered Ramon's commitment to the child and his fitness as a parent. (*Julia U.*, *supra*, 64 Cal.App.4th at pp. 542–544.) The court in *Julia U.* relied on *In re Zacharia D.*, *supra*, 6 Cal.4th at p. 450, which held: "'[I]f an unwed[, biological] father promptly comes forward and *demonstrates a full commitment to his parental responsibilities*[,] . . . his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Italics added.)

In contrast, here father was given a full opportunity to participate in this case with the assistance of appointed counsel. Mother identified him as the alleged father at the October 5, 2011 hearing and he was found to be an alleged father. He was interviewed by the Department on November 1, 2011. He appeared at the next hearing, on November 16, and was appointed counsel. At his request, the court ordered a paternity test. The results were received a month later and father was found to be K.F.'s biological father. Father failed to appear at the adjudication and contested dispositional hearings. He told a dependency investigator that he had missed drug tests because he had been out of state for a few weeks and had returned in early January 2012. Father did not file the statement regarding paternity form until May 7, 2012, but failed to explain how he had established paternity, whether he lived with the child, or how he had supported her.

7

The only changed circumstance cited by father in his section 388 petition to attain presumed father status is that, unbeknownst to counsel, he had regularly visited the child "at the time of the I/S order". But he had few visits with K.F. during the course of this case. He was admittedly absent from the state for a period of several weeks up to January 3, 2012. Only two visits occurred after January 9, 2012, one in May and one in July. Father's excuse was that the Department and the caregiver did not facilitate his visitation. He does not point to any record of his efforts to compel them to allow him to visit. Father had been participating in these proceedings for 10 months when his parental rights were terminated.

Father cites *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 in support of his argument that he was entitled to presumed father status because he made a sufficient, timely, and full commitment to his parental responsibilities, including emotional, financial, and other means of support. The case is inapplicable. As we have discussed, father failed to make a full commitment to his parental responsibilities. There is little evidence of emotional support for K.F. and no evidence of financial support. There is no evidence that mother or the Department precluded father from attaining presumed father status. Father saw K.F. in the hospital, but did not sign any paperwork regarding paternity at that time. As we have seen, father's due process rights were not violated since he was appointed counsel at his first appearance one month into this process and had an opportunity to be heard at every stage. (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 451.)

On this record, there was neither evidence that father demonstrated a full commitment to his parental responsibilities nor a violation of his due process rights. The court did not erroneously deny father parental rights.

II

Father also argues that the juvenile court erred in finding ICWA inapplicable because he provided the court with information that K.F. may have Cherokee ancestry. At the November 16, 2011 hearing, father filed a parental notification of Indian status form. He checked the box indicating that he "may have Indian ancestry" and identified

the tribe as Cherokee Indian. In the space for the name of the band, the following appears: "Grandmother—not a tribe member but had Cherokee roots." At the hearing, the trial court acknowledged that father had indicated that his grandmother may have Cherokee roots but is not a member of the tribe. Counsel for father confirmed this was the information provided. The trial court said: "I'm going to find that I.C.W.A. does not apply in this case."

"ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. [Citations.]" (*In re W.B.* (2012) 55 Cal.4th 30, 48 (*W.B.*).) "Among ICWA's procedural safeguards is the duty to inquire into a dependent child's Indian heritage and to provide notice of the proceeding to any tribe or potential tribes, . . . and, under some circumstances, to the Bureau of Indian Affairs." (*In re G.L.* (2009) 177 Cal.App.4th 683, 690.)

The Department contends that this information was not sufficient to trigger these obligations. We disagree. In *In re Alice M.* (2008) 161 Cal.App.4th 1189, the mother filled out a form[4] stating that the dependent child may have been a member of, or eligible for membership in, "'American Indian, Navajo-Apache." (*Id.* at p. 1194.) The Court of Appeal held that this information gave the court reason to know that the child may have been an Indian child. It concluded: "The ambiguity in the form and the omission of more detailed information, such as specific tribal affiliation or tribal roll number, do not negate appellant's stated belief that [the minor] may be a member of a tribe or eligible for membership." (*Id.* at p. 1198.) This information was found sufficient to trigger both a duty to inquire and a duty to give notice. (*Id.* at pp. 1198–1201; see also *In re J.T.* (2007) 154 Cal.App.4th 986, 993–994 [information that biological parents of adopted mother in dependency case had Sioux and Cherokee Indian ancestry but their names were unknown found to trigger requirement that notice be sent to all federally recognized Cherokee and

---

[4] In *In re Alice M.*, *supra*, 161 Cal.App.4th at page 1194, the form filled out by the mother was Judicial Council form JV-130 which was replaced, effective January 1, 2008, with Judicial Council form ICWA-020, the form used in this case. (*Id.* at p. 1194, fn. 2.)

Sioux tribes]; *In re Damian C.* (2009) 178 Cal.App.4th 192, 199 [mother's reference on ICWA form to Pasqua Yaqui heritage sufficient to trigger inquiry and notice requirements].)

The information provided by father was sufficient to trigger the inquiry and notice requirements of ICWA. We remand for compliance with those requirements.

## DISPOSITION

The order terminating parental rights is reversed. The matter is remanded to the juvenile court with directions to vacate its finding that ICWA does not apply and to instruct the Department to complete ICWA inquiry and notice. If, after proper notice, the court finds that K.F. is an Indian child, the court shall proceed in conformity with ICWA. If, after proper notice, the court finds that K.F. is not an Indian child, the order terminating parental rights and selecting adoption as the permanent plan shall be reinstated.

**NOT TO BE PUBLIHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


MANELLA, J.


SUZUKAWA, J.

10