Filed 9/30/16  In re A.N. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.N., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>S.V.,<br><br>       Defendant and Appellant. | A147351<br><br>(City & County of San Francisco Super. Ct. No. JC15-3224) |

S.V., biological father of one-year-old A.N., appeals from the juvenile court's jurisdictional and dispositional orders removing A.N. from her mother E.N.'s (Mother) care and placing her in foster care, and from the court's subsequent order denying his request for presumed father status.  He contends:  (1) the court erred in declining to rule on the issue of paternity at the jurisdictional and dispositional hearing; and (2) there is no substantial evidence supporting the court's finding that he is not A.N.'s presumed father.  We reject the contentions and affirm the orders.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2015, San Francisco Human Services Agency (Agency) filed a petition on behalf of A.N. and her half-sibling U.N.[1] alleging A.N. was at risk due to Mother's substance abuse, physical abuse, and history of being in a relationship characterized by domestic violence with S.V.  The petition listed S.V. as A.N.'s alleged father.  Regarding S.V.'s relationship with Mother, the petition alleged:  "The mother and father have a relationship that is characterized by domestic violence in that the mother reports that while she was living with the father over the past year, they engaged in mutual pushing on multiple occasions that the mother considered to be violent.  The mother has stated that she is fearful of the father and that she does not plan to return to live with him."  Regarding S.V.'s relationship with A.N., the petition alleged:  "the father failed to protect the minor from the effects of the mother's substance abuse and violence towards that minor's half-sibling," and that "although an address has been provided for the father, who lives in another county, he is not currently involved in the minor's life and is not providing support for the child."

According to the detention report, U.N. and A.N. were taken into protective custody on July 23, 2015, after Mother was seen grabbing U.N. roughly, dragging him, and throwing him down onto the pavement while pushing A.N. in a stroller down Market Street in San Francisco at 1:20 a.m.  When officers arrived, they noted U.N. had multiple cuts and bruises over his face, neck, arm, hands and leg areas.  Mother was intoxicated and did not seem to grasp what was going on.  She was arrested, U.N. was taken by ambulance to a hospital for medical evaluation, and A.N. was taken to the police station.

An Agency social worker interviewed Mother on July 23, 2015.  Mother reported that A.N.'s father was S.V.  She and S.V. were in a relationship at the time of A.N.'s conception but the two were not married and S.V. did not sign A.N.'s birth certificate.  She and the children had been living with S.V. in Merced but had left due to S.V.'s

---

[1]U.N. is not a party to this appeal.

verbal abuse. She and S.V. pushed each other at times, and their relationship involved domestic violence. Mother was fearful of S.V. but was not ready to request a restraining order. She did not intend to return to S.V.'s residence.

S.V. appeared for the detention hearing on July 28, 2015, and was appointed counsel. The juvenile court detained A.N. and ordered paternity testing for S.V. The court scheduled a "J1" hearing for August 11, 2015, and a settlement conference for August 25, 2015.

On July 30, 2015, S.V. filed a JV-505 Statement Regarding Parentage, stating he was A.N.'s parent and requesting a judgment of parentage and a finding that he was A.N.'s presumed father. He stated A.N. had lived with him from June 16, 2015, to July 21, 2015, and that he had taken her to visit "bio family members every week." He stated he bought food, formula, and clothes in excess of $1,000 and that she spent two to three days per week with his family in Bakersfield. S.V. stated he wanted "full custody until [A.N.'s] mother gets help with her serious mental health issues."

On August 21, 2015, the Agency filed a disposition report. According to the report, S.V. said he did not know Mother was pregnant until she and the children came to his home to live with him in June 2015. He had an appointment for paternity testing and wanted custody if he was found to be the father. S.V. said that he and Mother, U.N., and A.N. lived together in a volatile environment due to Mother's mental health issues. Mother heard voices, saw things, woke up randomly in the middle of the night and kicked walls, and broke doors. She was also violent towards S.V. and would jump on his back. S.V. was concerned about Mother's alcohol abuse. She would leave the children in a room, shut the door, and leave the house, and S.V. would find the children crying. She was abusive and neglectful and left the children in a car. Mother ignored U.N. and would kick him away when he would try to come to her, would not let him stay in her bed, and would seclude him in his own room. S.V. saw Mother hit U.N. in the back with a closed fist. S.V. had to remind Mother 20 to 30 times to change the baby's diaper, as he was working outside the home. S.V. said he had called the police "a few times" to try to have

3

Mother "psychiatrically hospitalized" and that friends and neighbors had also called the police, but that nothing was done.

The report set forth S.V.'s criminal history, which included a suspended driver's license, a 2006 burglary arrest with a misdemeanor conviction for petty theft and loiter, a 2007 arrest for petty theft, a 2008 misdemeanor conviction for petty theft, a 2010 arrest for possession of marijuana for sale and "adult supply minor control substance," which was dismissed, and a 2015 arrest for burglary in Merced. The report recommended that no reunification services be provided to S.V. because he was an alleged father who did not have a relationship with A.N. The Agency also interviewed Mother, who said that when she lived with S.V., he would hit her and tell her to change the baby, and that there was "pushing." Mother was living in a hotel and was "stressed due to all of this." On September 4, 2015, the juvenile court set the matter for a contested jurisdictional and dispositional hearing on November 4, 2015, at 9:00 a.m., with a trial submissions schedule. The court also set a mandatory settlement conference for October 21, 2015. A DNA test, filed on October 13, 2015, indicated that S.V. is A.N.'s biological father.

On October 28, 2015, S.V. moved ex parte to shorten the time for notice and hearing on a motion for paternity status. In support of the application, S.V. sought presumed father status, declaring he was not aware Mother had given birth to A.N. until June 2015, when Mother "reappeared" with A.N., and that S.V. thereafter secured a rental home in Merced for the family. He stated that Mother told him on July 22, 2015, that she was going to San Francisco for the day, and that she did not return the next day, as she was arrested early the following morning and A.N. was taken into protective custody. He declared that during the time he lived with Mother and A.N., he cared for A.N., took her to visit his family in Bakersfield "virtually every week, for two to three days per visit," and spent an estimated $1,000 on basic necessities related to her care. He declared that he held A.N. out to the world as his daughter by telling his "mother, father, uncles and various friends" about A.N. S.V.'s counsel also filed a declaration in support of the application, stating S.V. "needs to be adjudicated as [A.N.'s] presumed father prior to commencement of trial." The same day, the juvenile court denied counsel's request

4

for an order shortening time, but ordered that S.V.'s paternity status be changed from alleged to biological.

S.V. appeared at the jurisdictional and dispositional hearing by telephone on November 4, 2015. Mother did not appear and her whereabouts were unknown. An Agency social worker testified that S.V. was not at A.N.'s birth and had not signed her birth certificate because he did not know Mother was pregnant and did not know about A.N.'s birth. When he found out about A.N., S.V. rented a house in Merced and bought provisions for the family "during the very brief time that they were living together . . . ." S.V. and Mother engaged in frequent arguments about Mother's difficult and rough treatment of U.N. The social worker testified that during an Agency interview, Mother said S.V. was violent towards her, that she was afraid of S.V., and that she and S.V. would get into pushing matches. Mother said she left S.V. in part to get away from "those issues." The social worker testified that S.V. had told her he wanted to be present in A.N.'s life.

Another social worker testified that she interviewed S.V. to discuss the case, and that later, after he was found to be A.N.'s biological father, she asked him to provide information about possible placement and family members. As of the date of the hearing, S.V. had not provided her with any information about possible placements.

S.V.'s right to participate and cross-examine witnesses and whether he could elevate his status from biological father status to presumed status at the hearing was the subject of much back and forth between counsel and the court. Ultimately, the juvenile court stated it would not rule on S.V.'s paternity status because S.V. had not filed a motion and the issue had not been briefed. However, the court stated: "As for bio father [S.V.], you have the right to contest the allegations as well as demonstrate that a failure or failure to provide services would be contrary to the best interests of the minor."

S.V. testified that he met Mother on June 11, 2014, and that they dated "[o]ff and on until . . . the beginning of September [2014]," but did not live together. After their relationship ended, he changed his phone number and did not see her until early June 2015, when she "just showed up" with A.N. and said " 'this is your daughter.' " On

5

June 16, 2015, he rented a house and paid six months of rent in advance. However, Mother started "acting out" and hearing voices in early July 2015, and S.V. kicked her out of the house on or about July 22, 2015. Mother returned the next day, "grabbed the children," and said she would be back later that afternoon. He did not hear from her "for a week" until he called Mother's father and learned Mother had been arrested the night she left.

During the five or six weeks S.V. lived with Mother, U.N., and A.N. in his rental home, he purchased "a couple of toys, some bottles, diapers, wipes" and formula for A.N. He took her to Starbuck's, to the park, and to Bakersfield to visit his uncle. He witnessed mother "drink a lot" and "be really drunk" to the point where she could not "take care of herself and the kids." She would ignore U.N. and would slap and hit U.N. when he "would get on her nerves." She would neglect both children. On one occasion, S.V. saw Mother hit U.N. with a closed fist on his head. Mother also "would just randomly come up behind me and just attack me, push me down or try to push me into a wall, and she'd just go crazy because I guess she hears voices. So I would grab the kids and I would leave. I would go to Bakersfield or go to my mom's house for a little bit."

S.V. and Mother slept in different rooms at night, and S.V. would lock his door because Mother had threatened to stab him while he slept. She would also get up between 3 and 4 a.m. and kick the wall. Beginning in early July 2015, until Mother and the children moved out of the home on or about July 22 or 23, 2015, there was a "constant threat" from Mother towards S.V. A.N. slept with Mother in Mother's room; she did not allow U.N. to sleep next to her.

S.V. testified that he did not call the police at any time after Mother engaged in domestic violence against him. He also did not call the police or Child Protective Services when Mother hit U.N. because "[i]t was just something I figured I would deal with there at the house." When asked by the Agency attorney whether he had taken any steps to establish that A.N. was his child, S.V. responded, "No, I did. I tried. Like I said, [Mother] is a very difficult person to deal with, so in order for me to go do anything I tried to get my kids so I could try to go down to a couple places to try to figure out where

6

and what I need to do to get put on the birth certificate and to be as her biological father, to be known as that." "I'm not really sure how I was going to go about doing that and I was looking into it." S.V. acknowledged his driver's license was suspended for failing to pay a ticket, and that he was convicted of petty theft and loitering in 2006, arrested for burglary in 2006, arrested for petty theft in 2007 and 2008, convicted of petty theft in 2008, and arrested for burglary in 2015.

At the close of the hearing, after arguments by counsel, the juvenile court sustained the allegations regarding domestic violence in the relationship between Mother and S.V., the allegation that S.V. "failed to protect the minor from the effects of mother's substance abuse and violence towards the mother's half sibling," and the allegation that S.V. has not been involved in A.N.'s life. On disposition, the court found that awarding reunification services to S.V. was not in A.N.'s best interests at the time.

On December 4, 2015, S.V. filed a motion for presumed father status under Family Code, section 7611, subdivision (d), claiming he received A.N. into his home and openly held her out as his own. The motion was supported by the same declaration, outlined above, that S.V. used to support his prior ex parte application. The Agency opposed the motion, arguing, among other things, that S.V. shared a home with A.N. and Mother for, "at most, six weeks," and that there was no evidence he took prompt legal action to obtain custody of A.N. or have his name placed on her birth certificate. At a hearing on the motion on January 5, 2016, the juvenile court denied S.V.'s motion for presumed father status.

DISCUSSION

S.V. contends: (1) the juvenile court erred in declining to rule on the issue of paternity at the jurisdictional and dispositional hearing; and (2) there is no substantial evidence supporting the court's finding that he is not A.N.'s presumed father. We conclude that any error in declining to rule on the paternity issue at the jurisdictional and dispositional hearing was harmless under any standard because the court ultimately ruled on the matter, and the court would not have found S.V. to be A.N.'s presumed father had it made that determination at the jurisdictional and dispositional hearing.

7

There are three types of fathers in juvenile dependency law: presumed, biological, and alleged. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) A presumed father is a man who meets one or more specified criteria in Family Code, section 7611, by, for example, marrying or attempting to marry the child's mother, executing a declaration of paternity, or receiving the child into his home and openly holding the child out as his natural child. (§ 7611, subds. (a), (b), (d).) A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father. An alleged father is a man who has not established biological paternity or presumed father status. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) These categories are meant "to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708.)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) Only a presumed father is entitled to appointed counsel, custody (if there is no finding of detriment) and reunification services. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) In contrast, a biological father is not entitled to these rights merely because he wants to establish a personal relationship with his child. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 844 (*Kelsey S.*) ["it is clear that the Legislature meant to provide natural [biological] fathers with far less rights than both mothers and presumed fathers have under California's statutory system"].) Thus, a court may provide reunification services to a biological father only if it determines that services will "benefit the child." (Welf. & Inst. Code, § 361.5, subd. (a).)

Under Family Code, section 7611, subdivision (d), an unwed presumed father is one who holds a child out as his own and receives the child into his home. "In determining whether a man has 'receiv[ed] a child into his home and openly h[eld] out the child' as his own . . . courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain

8

custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after [he or she] no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*In re T.R.*, *supra*, 132 Cal.App.4th at p. 1211.)

A presumed father's "rights flow from his relationship (or attempted relationship) to the mother and/or child and not merely from his status as the biological father." (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 972.) The policy underlying the statute is "the protection of already developed parent-child relationships for the purpose of providing stability to children." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 776, italics omitted.) It is not enough to demonstrate "only a caretaking role and/or romantic involvement with a child's parent;" the father must have a "*fully developed parental relationship*" and demonstrate an "assumption of responsibility." (*Id.* at pp. 776–777.) Presumed fatherhood "denotes one who 'promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise[.]' " (*In re Jerry P., supra*, 95 Cal.App.4th at pp. 801–802, quoting *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) The "critical distinction is not the living situation but whether a parent-child relationship has been established," where the father has demonstrated a "commitment to the child and the child's welfare." (*Martinez v. Vaziri* (2016) 246 Cal.App.4th 373, 384–385.) The father must demonstrate " 'an abiding commitment to the child and the child's wellbeing.' " (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.)

Here, as soon as S.V. found out he was A.N.'s father, he rented a home for the family and lived with Mother, A.N., and U.N. for a little over five weeks, during which he purchased "a couple of toys, some bottles, diapers, wipes," and formula for A.N. He took her to Starbuck's and to the park. He told some family members and friends about A.N. and took her to visit his mother and uncle. While these acts are commendable, they

were far from sufficient to show his full commitment to parental responsibilities, specifically, his commitment to A.N.'s welfare and wellbeing when it was needed most.

S.V. testified that he witnessed Mother "drink a lot" and "be really drunk" to the point where she could not "take care of herself and the kids." She ignored U.N., slapped him when he "would get on her nerves," hit him in the head with a closed fist, and neglected both children. She had mental health issues, engaged in violent and erratic behavior, heard voices and would "go crazy." Despite this, S.V. did not call Child Protective Services or the police. He knew Mother would get up between 3 and 4 a.m. to kick the wall, and even locked his own door at night for fear of being stabbed by her, yet allowed A.N. to sleep with Mother. He watched as Mother "grabbed the kids" and left the home, and did not take any action even though he did not hear from her "for a week." If S.V. had been fully committed to A.N. as a parent, he would have taken steps to protect A.N. from Mother while they were living together, and would not have let Mother take her from the home on or about July 22, 2015. He would have contacted authorities later that day, or at least the next day, when Mother and the children did not return.

Moreover, S.V. did not make sufficient efforts to establish his paternity outside of this dependency case. In *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652–1654, the Court of Appeal affirmed the juvenile court's order denying presumed father status where the alleged father lived with the minor and his mother for two years, told friends, relatives and neighbors about the minor, took the minor on outings, provided childcare, and disciplined him, but "failed to take formal steps to place his name on the birth certificate, to establish paternity by legal action, or to assume the financial obligations for child support." Similarly, here, although S.V. lived with A.N. for some time and told some family members and friends about A.N., he took no steps to legally establish his paternity or obtain custody during the short period A.N. lived with him. As noted, when asked by the Agency attorney whether he had taken any steps to establish that A.N. was his child, S.V. responded, "No, I did. I tried. Like I said, [Mother] is a very difficult person to deal with, so in order for me to go do anything I tried to get my kids so I could try to go down to a couple places to try to figure out where and what I need to do to get

10

put on the birth certificate and to be as her biological father, to be known as that." "I'm not really sure how I was going to go about doing that and I was looking into it." His actions, as a whole, were insufficient to satisfy the requirement that he "openly and publicly admitted paternity." (*Id*. at pp. 1653–1654.)

Finally, S.V. argues that even if he did not meet the requirements of Family Code, section 7611, subdivision (d), he would have qualified as "a *Kelsey S.* father." S.V.'s reliance on *Kelsey S.*, *supra*, 1 Cal.4th 816, is misplaced. There, the Supreme Court held that the right to presumed father status may also be asserted by an unwed biological father who comes forward at the first opportunity to assert his parental rights after learning of his child's existence (or the mother's pregnancy), but is prevented from becoming a presumed father under Family Code, section 7611, by the unilateral conduct of the child's mother or a third party's interference. (*Id*. at p. 849.) Here, S.V. testified that he first discovered he had a daughter when Mother "showed up" in June 2015 with A.N. and said "this is your daughter." Shortly thereafter, he moved in with Mother, A.N. and U.N. Once S.V. learned of A.N., there was no interference by Mother or a third party preventing S.V. from becoming a presumed father under Family Code, section 7611, subdivision (d). Rather, it was S.V.'s own failure to assert his paternal rights and exhibit a full commitment to A.N. that prevented him from becoming a presumed father. *Kelsey S.* does not apply to this case, where there was no barrier for S.V. to assert his rights once he learned of A.N.

### DISPOSITION

The juvenile court's orders are affirmed.

11

                            _____

                            McGuiness, P.J.

We concur:


_____

Pollak, J.


_____

Jenkins, J.