Filed 12/10/24  In re J.R. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.F.,<br><br>Defendant and Appellant. | F088097<br><br>(Super. Ct. No. JD145368-00)<br><br>**OPINION** |

THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Sean Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Hill, P. J., Poochigian, J. and Detjen, J.

Appellant C.F. appeals from the juvenile court's order denying his request for presumed father status of J.R., the son of appellant's girlfriend. Appellant contends he is entitled to presumed father status because he proved by a preponderance of the evidence that he received J.R. into his home and held J.R. out as his natural child. In the alternative, appellant contends the court misunderstood the law because the court erroneously believed he was barred from presumed father status for not owning the premises where J.R. lived and improperly concluded appellant had not assumed the burdens of fatherhood because he was poor.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Dependency Case and Detention

On December 8, 2023, the Kern County Department of Human Services (the department) filed a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1) regarding J.R., born in May 2023. The petition alleged J.R. was at substantial risk of serious physical harm or illness due to inadequate shelter by his mother, B.W. (mother), and mother's inability to provide regular care for J.R. due to her substance abuse.

The department's detention report, dated December 8, 2023, stated that Arvin police responded to a report from child protective services that J.R was getting hit by his mother and methamphetamine was being smoked inside the house with J.R. On December 6, 2023, an Arvin police officer discovered J.R. and mother living in a shed on the side of a house. The shed had no signs of running water or electricity. The conditions inside the shed were considered unsafe and unsanitary for J.R. There were several needles in the shed, including one containing a black substance believed to be heroin. Mother had milk for J.R. and denied hitting him. J.R. had no marks or injuries indicating physical abuse. A referral to the department was made which stated that J.R.'s father was deceased. J.R. was taken into protective custody.

2.

A social worker spoke with mother by phone on December 7, 2023. Mother identified appellant as J.R.'s father. When the social worker reported her understanding J.R.'s father was deceased, mother clarified that appellant had been her boyfriend for almost a year but J.R.'s father, A.R., was deceased. A.R. was not named on J.R.'s birth certificate. Mother asked about getting appellant's name on the birth certificate and was directed to the public health department. Mother recognized the shed was not the best living environment but said it was better than living on the streets. She was going to move to appellant's mother's home in Bakersfield later that day. Mother confirmed she had supplies for J.R. and he was healthy. She admitted recent and regular use of methamphetamine. Mother denied ever hitting J.R.

The juvenile court held a detention hearing on December 11, 2023, which could not be completed and was continued to December 13, 2023. At the initial hearing, mother was present, but appellant was not as he was in the local sheriff's custody. The court conducted a paternity inquiry. Mother had never been married and identified J.R.'s possible fathers as A.R. and appellant. A.R. had died in February of that year. Mother's relationship with appellant started about a year ago. She began living with appellant when she was six months pregnant, and he was at the hospital when J.R. was born. Mother and appellant did not sign a declaration of paternity at the hospital because they were unsure if appellant was the father. No father was listed on J.R.'s birth certificate. Appellant lived in the same home with J.R. after he was born and provided money and "items" to J.R. and mother. Appellant told his family and friends he was J.R.'s father and never denied he was the father.

The juvenile court questioned mother about why she told the social worker J.R.'s biological father was dead instead of saying appellant could be the father. Mother responded that it sounds bad, but the father could be A.R. or appellant.

After the detention hearing was continued, appellant filed a JV-505 Statement Regarding Parentage on December 13, 2023. He believed he was J.R.'s parent and asked

the court to enter a judgment of parentage. Appellant stated J.R. lived with him from May 23 to December 6, 2023. He told all his friends and family that J.R. was his child. Appellant had participated in diapering, feeding, rocking J.R. to sleep, and playing with him. He had been raising J.R. with mother. Appellant had given J.R. "everything he need[ed,]" including food, diapers, clothing, toys, bottles, and pacifiers. J.R. had spent time with appellant's mother and other son, as well as appellant's father, siblings, and extended family. Appellant stated, "I love my son, [mother] and I will do everything we can to get him back. I also would like him placed with my mom, because I know that she will provide a safe and loving environment."

Appellant was present and represented by counsel at the December 13, 2023 hearing. Through his attorney, appellant requested the juvenile court elevate him to presumed father status. Mother and J.R.'s attorney joined the request, but the department objected. The court denied appellant's request given the state of the evidence at that time. The court noted appellant presumably knew about the circumstances in which mother and J.R. were living and found those circumstances were unsafe for J.R.

The juvenile court found a prima facie showing had been made that J.R. was described under Welfare and Institutions Code section 300 and continuance of J.R. in mother's care was contrary to his welfare. J.R. was ordered detained from mother and placed in a foster home. Visitation between mother and J.R. was ordered but visitation with appellant was deferred pending DNA testing.

### B. Jurisdiction

The department submitted a social study report, dated January 25, 2024, for the jurisdictional hearing. The social worker conducted an in-person interview of mother on December 13, 2023. Mother had an appointment to enter an inpatient program for her substance abuse. When asked to drug test, mother indicated she preferred to go to the lab to test later. Mother did not have identification because her identification was in her car when it was towed a couple hours after J.R. was removed. Mother's car stopped working

4.

so she and appellant tried to move it off the road.  The police showed up, towed mother's car, and arrested appellant.  Mother confirmed appellant was staying with her at her home in Arvin prior to his arrest.  The social worker did not interview appellant.

At the jurisdictional hearing on February 7, 2024, mother waived her right to a trial and did not present any evidence or argument.  Appellant was not present as he was still incarcerated and refused transport.  Appellant's counsel objected on his behalf to the dependency petition but did not present any evidence or argument.  The juvenile court found true the allegations in the petition.  The matter was continued for the department's disposition report, which had been delayed pending the DNA results.

## C. Disposition

The department submitted a disposition report dated April 2, 2024.  The report stated DNA testing determined appellant was not J.R.'s biological father.  Appellant was still incarcerated in the pretrial facility in Bakersfield.  The department recommended no services for appellant as the alleged father or if he was elevated to presumed father status.  Reunification services were recommended for mother.  The department submitted a supplemental report, dated May 16, 2024,  again recommending services for mother but not appellant.

The disposition hearing proceeded on May 21, 2024.  Mother was present and appellant appeared from prison via the court call system.  Appellant's counsel acknowledged the DNA test confirmed appellant was not the biological father but argued that did not preclude him from being the presumed father.  Counsel argued appellant lived with mother during her pregnancy and the only reason the couple did not sign a declaration of paternity at the hospital was because they were unsure of paternity.  Appellant and mother lived together with J.R. until J.R. was detained, during which appellant provided support and held J.R. out as his own to family and friends.  Appellant never denied being J.R.'s father.  While appellant was in custody, he was likely to be released in October.  Appellant wished to get involved in a case plan and be a father to

5.

J.R.

The juvenile court queried whether J.R. was welcomed into appellant's home or if they lived in mother's home. The parties discussed that the record indicated appellant moved into mother's family's home. Appellant's counsel argued mother and appellant had lived in mother's home with J.R. for approximately six months during which appellant "paid expenses" there. J.R.'s counsel joined appellant's request for presumed father status.

In opposing appellant's request, the department argued a woman permitting her boyfriend to reside in her home is not demonstrative of a commitment to the child but rather a person acting out of personal convenience and self-interest, citing *In re Spencer W.* (1996) 48 Cal.App.4th 1647. The department argued appellant had not demonstrated a full commitment as a parent to J.R. and there was no evidence he had any parental relationship with J.R. Counsel noted appellant and mother were living in a shed attached to mother's family home with drugs when J.R. was removed from mother's care. Mother went to appellant's mother's home after J.R. was detained so there were options appellant could have exercised. J.R. was only six months old when detained and appellant had been in custody the entire time so J.R. had not had any contact with appellant in over six months and was an infant. Counsel concluded by arguing the court had previously denied the request to be presumed father and there was nothing different since then.

The juvenile court acknowledged sometimes struggling with the difference between presumed father in a family law context and in juvenile dependency law. The court questioned the department if there was "a [']best interests' consideration or if [Family Code section] 7611[, subdivision] (d) [1] applies across the board to juvenile

---

[1]     Undesignated statutory references are to the Family Code.

[cases]?" The department clarified that when there are two presumed fathers, the court weighs the presumption and finds whether it is in the child's best interests.

In reaching its ruling, the juvenile court stated in relevant part:

> " … I cannot find he was providing for this child, given the fact that they were living in a shed, mother's shed, which is one of the reasons the child was removed from the mother.

> "So I find that he does not meet the [¶] [c]riteria for a presumed father under [section] 7611[, subdivision] (d) because he was in the mother's home. Mother—he didn't welcome the mother into his home, and there is insufficient evidence that he actually operated as—sorry, that he demonstrated a consistent commitment to assume the burdens of parenthood, which is a quote from *Spencer W*."

The court dismissed appellant from the case. J.R. was adjudged a dependent and removed from mother's custody. Reunification services were ordered for mother for six months.

Appellant filed a timely notice of appeal.

## DISCUSSION

### A. Relevant Law

"Dependency law recognizes three types of fathers: presumed, alleged and biological." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208.) "A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled. [Citation.] 'Presumed father status ranks highest.' [Citation.] Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan." (*Id*. at p. 1209.)

Section 7611, subdivision (d) provides presumed father status if a person shows he " 'receives the child into his or her home and openly holds out the child as his or her natural child.' " (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 143.) "Biology is not determinative of presumed fatherhood." (*Ibid*.) "A person requesting presumed parent

7.

status under section 7611, subdivision (d) must have a 'fully developed parental relationship' with the child. [Citation.] A 'caretaking role and/or romantic involvement with a child's parent' is not enough to qualify. [Citation.] A presumed parent must demonstrate ' "a full commitment to [parental] responsibilities—emotional, financial, and otherwise." ' " (*In re M.Z.* (2016) 5 Cal.App.5th 53, 63.)

"A person who claims entitlement to presumed parent status has the burden of establishing by a preponderance of the evidence the facts supporting the entitlement." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774.) In determining presumed father status, "courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*In re T.R.*, *supra*, 132 Cal.App.4th at p. 1211.) "No single factor is determinative; rather, the court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home." (*R.M.*, at p. 774.)

"[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528,

overruled on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

### B. Analysis

Appellant argues the evidence he is a presumed father as shown in his JV-505 statement and mother's testimony was uncontradicted and unimpeached. Even if that may be so, appellant must show the evidence compelled a finding in his favor as a matter of law. This he cannot do because the evidence does not show appellant had demonstrated a full commitment to parental responsibilities for J.R.

Mother was already six months pregnant when appellant moved in with her. Appellant and mother had a relationship before then, but there is no evidence appellant assisted mother during her pregnancy either before or after moving in, nor is there evidence he helped mother obtain pregnancy care or paid for pregnancy or birth expenses.

Mother testified she and appellant did not sign a declaration of paternity at the hospital when J.R. was born because they were unsure of paternity. (See § 7574, subd. (b)(5)(A) [mother must attest that the person signing the declaration "is the only possible genetic parent other than the woman who gave birth"].) However, a declaration of paternity is not required to be signed at the hospital when the child is born as "a valid declaration of paternity may be made at any time after the child's birth." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1507–1508; § 7571, subd. (d).) After J.R. was taken home from the hospital, appellant did not take steps to obtain a legal right to custody of J.R. or have his name added to the birth certificate.

Mother replied in the affirmative when asked if appellant "provide[s] [her] and [J.R.] any money or items?" But there was no testimony from mother about which items appellant provided or the extent of his support. Appellant asserted in his JV-505 statement that he gave J.R. "everything he need[ed,]" including food, diapers, clothing, toys, bottles, and pacifiers. Other than mother's limited testimony, there was no evidence

9.

about the extent appellant provided for J.R., i.e., whether appellant's contribution was sporadic or regular. Though appellant claims on appeal he was the "family's sole provider," he cites only mother's lack of income to support this claim.

Appellant argues the juvenile court erroneously found appellant did not receive J.R. into his home because appellant did not own the shed mother and appellant lived in before and after J.R. was born. The court relied on *Spencer W.*, in which the father, Leonard, shared an apartment with the mother and child for two years and lived off the mother's welfare checks. (*In re Spencer W.*, *supra*, 48 Cal.App.4th at pp. 1650–1651.) Although Leonard told people he was the child's father, he never sought to have his name put on the birth certificate, took no other legal action to establish paternity, and separated from the mother when her welfare payments stopped. (*Id*. at p. 1651.) The court of appeal upheld the finding Leonard was not entitled to presumed father status because the evidence showed he resided in mother's home out of convenience, not out of a commitment to the child. (*Id*. at p. 1653.)

We agree with appellant "there is no requirement that a presumed parent prove he or she rents or owns a residence in order to qualify as a presumed parent. One's 'home' is the place where one resides." (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 495.) Ownership of the shed is thus not dispositive on whether appellant received J.R. into his home. But "the child's physical presence within the alleged father's home is, by itself, insufficient under section 7611, subdivision (d)." (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145.) An alleged father must demonstrate "something more than a man's being the mother's casual friend or long-term boyfriend; he must be 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother." (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.) While appellant claims the juvenile court improperly concluded he had not assumed the burdens of parenthood because they were living in a shed, we disagree the type of residence was the primary

focus of the court's evaluation of appellant's commitment to J.R. Rather, the circumstances in which appellant, mother, and J.R. were living within that residence did not support appellant's assertion he had provided J.R. with "[e]verything he needs." (See *In re M..Z.*, *supra*, 5 Cal.App.5th at p. 63 [" 'The critical distinction is not the living situation but whether a parent-child relationship has been established.' "].) The shed had multiple needles lying around, did not have water or electricity, and was described as unsafe and unsanitary for J.R. These living conditions do not evince familial concern for J.R.'s welfare. We do not fault appellant for his poverty, but the record gives no explanation for why appellant did not pursue alternative, more suitable living arrangements for J.R. including his mother's residence, which appellant later recommended for placement of J.R. as a "safe and loving environment" and where appellant's other son lived.[2] Indeed, appellant even asserts he could have moved into his mother's residence instead of moving into the shed with mother and J.R. Mother moved into appellant's mother's home after J.R. was detained so she was evidently welcome there. Though appellant asserts he moved in with J.R.'s mother for the purpose of establishing a parent-child relationship with J.R., it is unclear why the couple and J.R. did not move in with appellant's mother after J.R.'s birth, a presumably superior location for J.R. There was no information beyond appellant's counsel's bare assertion to the court that appellant "paid expenses there" about whether appellant provided financial support in the form of rent for the shed or if mother's family allowed the couple and J.R. to live there for free. If appellant needed public benefits to provide for J.R., there is no evidence

---

[2] We are not persuaded, as appellant asserts, the juvenile court concluded appellant "had not assumed the burdens of parenthood essentially because he was poor." Rather, the court logically considered the circumstances in which J.R. was found in determining whether the evidence supported appellant's claim he had provided for J.R. To the extent appellant criticizes the court for not determining if appellant contributed financially commensurate with his ability, it was appellant's burden to show his commitment to J.R. and, therefore, any lack of evidence is attributed to him.

he made any effort to obtain such assistance.

Appellant claims he told all family and friends that J.R. was his son but identified no specific individuals to whom he held J.R. out as his son. He also asserts J.R. has "spent time" with appellant's parents and "been introduced to" his older son. Appellant's vague assertions he held J.R. out as his own are insufficient to demonstrate he has "a fully developed parental relationship with the child." (*R.M. v. T.A.*, *supra*, 233 Cal.App.4th at p. 776, italics omitted.) Appellant's desire to act as a parent to J.R. is laudable, but "[i]t is the parental relationship that warrants protection, not the mere desire to parent a child." (*In re D.M.*, *supra*, 210 Cal.App.4th at p. 553.) "A person who is not a biological parent does not satisfy the 'openly holds out' requirement merely because he or she is willing to claim parentage. What ultimately matters to presumed parent status is a person's commitment to the child and the responsibilities of parenthood." (*In re Alexander P.*, *supra*, 4 Cal.App.5th at p. 494.) We cannot say the evidence shows as a matter of law that appellant has an "established relationship with and demonstrated commitment to [J.R.]." (*Id.* at p. 485.)

Appellant argues in the alternative that even if he did not meet his burden to prove presumed father status, remand is required because the juvenile court misunderstood the law when denying his request. Specifically, appellant contends the court erroneously believed the fact that appellant did not own the premises (the shed) barred a finding of presumed father status.

"When a trial court applies the wrong legal standard, a remand for further proceedings is certainly appropriate if an appellate court announces a new legal standard and it is unclear from the record whether the trial court would have reached the same result had it not lacked appellate guidance." (*In re J.R.* (2022) 82 Cal.App.5th 526, 532.) But when "the proper legal standard is already established and a party has had a full and fair opportunity to present all of their evidence on a contested issue, and yet in the end there is simply no evidence that could support a favorable finding for them, then any

legal error in the court's reasoning or basis for its decision quite obviously is harmless.… Simply put, a remand for factual finding is not appropriate when there are no factual issues to resolve due to a failure of proof by the party who has the burden of proof." (*Id.* at p. 533.)

Even if the juvenile court erroneously believed appellant did not welcome J.R. into his home because he did not own the premises where J.R. lived, the standard to show presumed father status is well established. Because appellant failed to meet his burden of proof to show a commitment to J.R., remand is not warranted. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason].)

In sum, appellant has not shown the evidence compels a finding in his favor as a matter of law. Thus, the juvenile court did not err in denying his request for presumed father status.

## DISPOSITION

The order is affirmed.